WASHINGTON TEACHERS' UNION, LOCAL # 6, Appellant,

v.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS, District of Columbia Board of Education, Clifford B. Janey (Superintendent of the District of Columbia Public Schools), Appellees,

and

AFSCME, District Council 20, Local 2921, AFL–CIO, Appellant,

v.

District of Columbia Public Schools, District of Columbia Board of Education, Clifford B. Janey (Superintendent of the District of Columbia Public Schools), Appellees.

Nos. 06–CV–1071, 06–CV–1072.

District of Columbia Court of Appeals.

Argued Feb. 19, 2008.

Decided Dec. 4, 2008.

Brenda C. Zwack, with whom Lee W. Jackson, Anton G. Hajjar, and Melinda K. Holmes, were on the brief, Washington, for appellants.

Holly M. Johnson, Assistant Attorney General, District of Columbia, Linda Singer, Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellees.

Before REID, GLICKMAN, and THOMPSON, Associate Judges.

REID, Associate Judge:

This case involves a dispute as to whether the Superior Court ("the trial court") or the Office of Employee Appeals ("OEA") should exercise initial jurisdiction over appellants' claims, as they are articulated in separate complaints filed by the Washington Teachers' Union, Local # 6 ("WTU") and the American Federation of State, County and Municipal Employees, District Council 20, Local 2921, AFL–CIO ("AFSCME") (collectively, "appellants"). In their respective complaints, appellants alleged that appellees, the District of Co-

lumbia Public Schools ("DCPS"), the Superintendent of the District of Columbia Public Schools (then Clifford B. Janey) ("the Superintendent"), and the District of Columbia Board of Education ("the Board") (collectively, "appellees"), violated the Comprehensive Merit Personnel Act ("CMPA") by improperly eliminating jobs and terminating around 700 teachers and school-based personnel ("WTU lawsuit") and about 26 Union-represented school employees—clerical employees and educational aides—("AFSMCE lawsuit"), through a 2004 reduction in force ("RIF").[1] Appellants appeal from the trial court's order granting appellees' motion to dismiss their complaints.

We hold that appellants must present their claims in the first instance to OEA. We further hold, in general agreement with the trial court, that the Abolishment Act procedures, imposed for budgetary reasons, appear to apply to the 2004 RIF, rather than the general RIF provisions of the CMPA. We also conclude that instead of dismissing appellants' complaints, the trial court should have stayed its proceedings and transferred the case to the OEA for a determination of OEA's jurisdiction; and for initial resolution of appellants' claims, if OEA confirms its jurisdiction. Accordingly, we remand the case to the trial court for a stay of proceedings and a transfer of the case to the OEA.

**FACTUAL SUMMARY**

The record before us shows that on October 22, 2004, and November 10, 2004, WTU and AFSCME, respectively, filed virtually identical complaints in the trial court. They alleged that in May of 2004, the DCPS notified approximately 700 teachers and school-based personnel,[2] and

---

1. The trial court consolidated the WTU and AFSCME lawsuits.

2. School-based personnel are "employees of the Board of Education who are based at a

approximately 26 Union-represented employees, that their positions were being abolished in a RIF,[3] effective June 30, 2004.[4] The abolishment was conducted in accordance with the Abolishment Act, D.C.Code § 1–624.08[5] (Repl.2006),[6] and

local school or who provide direct services to individual students." 5 DCMR § 1500.4(b) (2002).

3. Section 1500.2, Title 5, of the Board of Education regulations defines RIF as follows:

Reduction-in force (RIF) is a process whereby the total number of positions is reduced for one (1) or more of the following reasons:

(a) Budgetary reasons;

(b) Curtailment of work;

(c) Reorganizations of functions; or

(d) Other compelling reasons.

5 DCMR § 1500.2.

4. The Board of Education's May 11, 2004 resolution authorizing the abolishment of positions specified the reasons for the action, stating, in part:

[T]he [ ] Board of education must ensure that actions are taken in Fiscal Year 2004 so that a deficit will not occur in Fiscal Years 2004 and 2005; ....

[T]he abolishments are necessary to maintain fiduciary responsibility and to live within the approved budgetary authority;

[T]he abolishments will address and eliminate a longstanding structural budgetary problem that has been created by the declining and redistribution of student enrollment; and

[T]he Board is committed to taking actions that will ensure the Fiscal Year 2004 and 2005 Operating Budgets are balanced and comply with the requirements of the District['s] Anti–Deficiency Act.

The resolution "[d]irect[ed] the Interim Superintendent to reduce the FY 2004 Operating Budget by $29.3 million and 557.3 positions in school-based operations and $1.6 million and 27 positions in non-school based operations through the abolishment process."

5. The Congress of the United States added the Abolishment Act as a general provision of Public Law 105–100, the District of Columbia Appropriations Act, 1998, November 19, 1997. The Council of the District of Columbia later amended the applicable date to cover "the fiscal year ending September 30, 2000, and each subsequent fiscal year." D.C.Code § 1–624.08 (Repl.2006) provides:

§ 1–624.08. Abolishment of positions for fiscal year 2000 and subsequent fiscal years.

(a) Notwithstanding any other provision of law, regulation, or collective bargaining agreement either in effect or to be negotiated while this legislation is in effect for the fiscal year ending September 30, 2000, and each subsequent fiscal year, each agency head is authorized, within the agency head's discretion, to identify positions for abolishment.

(b) Prior to February 1 of each fiscal year, each personnel authority (other than a personnel authority of an agency which is subject to a management reform plan under subtitle B of title XI of the Balanced Budget Act of 1997) [Pub.L. 105–33] shall make a final determination that a position within the personnel authority is to be abolished.

(c) Notwithstanding any rights or procedures established by any other provision of this subchapter, any District government employee, regardless of date of hire, who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as provided in this section.

(d) An employee affected by the abolishment of a position pursuant to this section who, but for this section would be entitled to compete for retention, shall be entitled to one round of lateral competition pursuant to Chapter 24 of the District of Columbia Personnel Manual, which shall be limited to positions in the employee's competitive level.

(e) Each employee selected for separation pursuant to this section shall be given written notice of at least 30 days before the effective date of his or her separation.

(f) Neither the establishment of a competitive area smaller than an agency, nor the determination that a specific position is to be abolished, nor separation pursuant to this section shall be subject to review except that:

(1) An employee may file a complaint contesting a determination or a separation pursuant to subchapter XV of this chapter or § 2–1403.03; and

(2) An employee may file with the Office of Employee Appeals an appeal contesting

the Board's regulations governing "the termination of the employment of employees of the Board ... due to the lack of funds, lack of work, or reorganization of functions," 5 DCMR. § 1500.1, and other provisions of Chapter 15. Specifically, appellants alleged in Count I of their complaints, that DCPS and the Superintendent violated D.C.Code § 1–624.08(d) "by conducting an abolishment of [employees] ... and denying one round of lateral competition in accordance with Chapter 24 of the District of Columbia Personnel Manual." Count II asserted that the Board of Education violated D.C.Code § 1–608.01a (b)(2)(L)(i) of the CMPA,[7] "by failing to

that the separation procedures of subsections (d) and (e) were not properly applied.

(g) An employee separated pursuant to this section shall be entitled to severance pay in accordance with subchapter XI of this chapter, except that the following shall be included in computing creditable service for severance pay for employees separated pursuant to this section:

(1) Four years for an employee who qualified for veterans preference under this chapter, and

(2) Three years for an employee who qualified for residency preference under this chapter.

(h) Separation pursuant to this section shall not affect an employee's rights under either the Agency Reemployment Priority Program or the Displaced Employee Program established pursuant to Chapter 24 of the District Personnel Manual.

(i) With respect to agencies which are not subject to a management reform plan under subtitle B of title XI of the Balanced Budget Act of 1997 [Pub.L. 105–33], the Mayor shall submit to the Council a listing of all positions to be abolished by agency and responsibility center by March 1 of each fiscal year or upon the delivery of termination notices to individual employees.

(j) Notwithstanding the provisions of § 1–617.08 or § 1–624.02(d), the provisions of this chapter shall not be deemed negotiable.

(k) A personnel authority shall cause a 30-day termination notice to be served, no later than September 1 of each fiscal year, on any incumbent employee remaining in any position identified to be abolished pursuant to subsection (b) of this section.

(*l*) In the case of an agency which is subject to a management reform plan under subtitle B of title XI of the Balanced Budget Act of 1997 [Pub.L. 105–33], the authority provided by this section shall be exercised to carry out the agency's management reform plan, and this section shall otherwise

be implemented solely in a manner consistent with such plan.

6. On January 29, 2008, the Mayor of the District of Columbia signed legislation enacted by the Council of the District of Columbia which amended reforms relating to the public education personnel system in the District. D.C. Law 17–122, "the Public Education Personnel Reform Amendment Act of 2007," became effective on March 20, 2008.

7. D.C.Code § 1–608.01a (b)(2)(L)(i) (Repl. 2006) provided:

(b) The Board[ ] shall issue rules and regulations governing employment, advancement, and retention in the Educational Service, which shall include all educational employees of the District of Columbia employed by the Board[ ]. The rules and regulations shall be indexed and cross referenced as to the incumbent classification and compensation system.

(2) The Board of Education. The Board of Education shall issue rules and regulations which shall provide for the following:

. . . .

(L)(i) Reduction-in-force procedures, with: (I) a prescribed order of separation based on tenure of appointment, length of service, including creditable federal and military service, District residency, veterans preference, and relative work performance; (II) priority reemployment consideration for employees separated; (III) consideration of job sharing and reduced hours; and (IV) employee appeal rights;

(ii) Notwithstanding any other provision of law, the Board of Education shall not issue rules that require or permit non-school-based personnel or school administrators to be assigned or reassigned to the same competitive level as classroom teachers[.]

In 2008, subsection (L) was recodified as subsection (J), and was modified. It now specifies:

issue rules and regulations which provide for RIF procedures with a prescribed order of separation based on tenure of appointment and length of service; and which provide for priority re-employment consideration." Count III claimed that the Board "acted beyond the scope of its statutory authority, in violation of [D.C.Code] § 1–608.01a (b)(2)(L)(i) by issuing the RIF regulations contained in 5 DCMR, Chapter 15, which preclude separation based on tenure of employment and length of service and which deny employees the right to priority re-employment consideration." In their prayer for relief, appellants, in part, sought an order compelling appellees (1) "to comply with all applicable provisions of the CMPA, specifically §§ 1–608.01a (b)(2)(L)(i), 1–624.02,[8]

(J)(i) The Mayor shall establish reduction-in-force procedures, including:

(I) A prescribed order of separation based on District residency and veterans preference;

(II) Priority reemployment consideration of separated employees; and

(III) Job sharing and reduced hours, if feasible.

(ii) Notwithstanding any other provision of law or regulation, an Excluded Employee or a nonschool-based employee shall not be assigned or reassigned to replace a classroom teacher.

(iii) For the purposes of this subparagraph, the term "reduction-in-force" means a reduction in personnel, the need for which shall be declared by the Mayor, that is necessary due to a lack of funding or the discontinuance of a department, program, or function of an agency. A reduction-in-force shall not be considered a punitive or corrective action as it relates to an employee separated pursuant to the reduction in force and no blemish on an employee's record shall ensue.

D.C.Code § 1–608.01a (J) (2008 Supp.).

8. D.C.Code § 1–624.02 (Repl.2006) provided:

(a) Reduction-in-force procedures shall apply to the Career and Educational Services and to persons appointed to the Excepted and Legal Services as attorneys and shall include:

(1) A prescribed order of separation based on tenure of appointment, length of service including creditable federal and military service, District residency, veterans preference, and relative work performance;

(2) One round of lateral competition limited to positions within the employee's competitive level;

(3) Priority reemployment consideration for employees separated;

(4) Consideration of job sharing and reduced hours; and

(5) Employee appeal rights.

(b)(1) For purposes of this subchapter, a veterans preference eligibility will be defined in accordance with federal law and regulations issued by the U.S. Office of Personnel Management;

(2) Creditable service in determining length of service shall include all federal, District government, and military service otherwise creditable for Civil Service retirement purposes;

(3) Performance ratings documented and approved which recognize outstanding performance shall serve to increase the employee's service for reduction-in-force purposes by 4 years during the period the outstanding rating is in effect. Performance ratings may not be changed subsequent to the establishment of retention registers and issuance of reduction-in-force notices; and

(4) Employees serving on temporary limited appointments or having unacceptable performance ratings are not entitled to compete for retention.

(c) For purposes of this subchapter, each employee who is a bona fide resident of the District of Columbia shall have 3 years added to his or her creditable service for reduction-in-force purposes. For purposes of this subsection only, a nonresident District employee who was hired by the District government prior to January 1, 1980, and has not had a break in service since that date, or a former employee of the United States Department of Health and Human Services at Saint Elizabeths Hospital who accepted employment with the District government effective October 1, 1987, and has not had a break in service since that date, shall be considered a District resident.

(d) A reduction-in-force action may not be taken until the employee has been afforded

and 1–624.08"; (2) "to rescind the current regulations contained in Title 5, Chapter 15 of the DCMR"; (3) "to provide for one level of lateral competition based on retention standing and priority re-employment consideration ... for all teachers and employees affected by the 2004 abolishment"; and (4) "to make whole all affected employees[.]"

On July 16, 2005, appellees filed a motion to dismiss appellants' complaints pursuant to Super. Ct. Civ. R. 12(b)(6). After listening to the arguments of the parties at a hearing on July 26, 2006, the Honorable Leonard Braman agreed with appellees that CMPA requires appellants' claims to be presented to the OEA. In addition, the trial court stated that the general RIF procedures found in D.C.Code § 1–624.02 were inapplicable to this matter. Rather, said the trial judge, the RIF procedures under the Abolishment Act applied, and the general RIF procedures were "in a state of suspension" while the Abolishment Act was in effect. That is, "the Abolishment Act displaces the general RIF statute[,]" or "suspends it while the fiscal emergency continues." The trial court determined that under the Abolishment Act's RIF procedures, D.C.Code § 1–624.08(d) entitles an affected employee, who otherwise would be eligible to compete for retention, "to one round of lateral competition"; and D.C.Code § 1–624.08(e) calls for a thirty-day notice of the proposed separation. Furthermore, the trial court declared that under D.C.Code § 1–

624.08(f)(2), an affected employee is authorized to file an appeal with OEA. After examining the counts in appellants' complaints, the trial court decided that OEA has jurisdiction over each of the counts, not the trial court. Consequently, the court orally granted appellants' motion to dismiss. Following the hearing, the trial court issued a short written order, which referenced the hearing and concluded that it lacked subject matter jurisdiction. Appellants filed notices of appeal.

### ANALYSIS

Appellants contend that the trial court erred in dismissing their complaints on the ground that OEA has jurisdiction over their claims. They argue that their "claims ... are not merely a challenge to DCPS's application of its RIF regulations during the 2004 RIF." Rather, "the validity of the RIF regulations themselves is the basic premise of [appellants'] claims that the Court should review." They assert that "OEA's purpose is to entertain appeals by individual District employees who have been impacted by an agency personnel action"; and that "[n]either the statute nor the regulations contain any language even suggesting that the Council [of the District of Columbia] intended OEA to stand in judgment over the legal sufficiency of other agencies' personnel regulations." They insist that "OEA's authority is limited to the review of an agency's application of existing RIF regulations," and that

at least 15 days advance notice of such an action. The notification required by this subsection must be in writing and must include information pertaining to the employee's retention standing and appeal rights.
(e) Notwithstanding any other provision of law, the Board of Education shall not require or permit non-school-based personnel or school administrators to be assigned or

reassigned to the same competitive level as classroom teachers.
In 2008, subsection (a) was modified to read:
(a) Reduction-in-force procedures shall apply to the Career and Educational Services, except those persons separated pursuant to [section] 1–608.01a (b)(2), and to persons appointed to the Excepted and Legal Services as attorneys and shall include:
D.C.Code § 1–624.02 (2008 Supp.).

"OEA's expertise is in the application of rules, but not the design of those rules ...." As appellants put it, "this case does not rest solely on the District's 'conduct in handling personnel' actions that implicate OEA's jurisdiction[;][r]ather, this case concerns the District's implementation of regulations in the first place, and a review of the propriety of those regulations does not rest exclusively or primarily with OEA." Relatedly, they rely on "[t]he presumption of reviewability of DCPS's RIF regulations by the court[ ] ...."

Appellees' response notes that appellants have presented on appeal a claim that is different from that in the complaint, that is, "a stand-alone challenge to the RIF regulations, wholly unrelated to the [2004] RIF conducted pursuant· to those regulations." Furthermore, they emphasize that "[u]nder CMPA, employees separated under a RIF cannot bring an original action arising out of that RIF in Superior Court." Thus, they argue, "[b]ecause the OEA has exclusive jurisdiction over an employee's challenge to a RIF, and the Abolishment Act expressly precludes review of a RIF brought by anyone other than a separated employee, the trial court properly held that it did not have subject matter jurisdiction over [appellants'] claims." Alternatively, appellees contend, "[t]o the extent that [appellants'] lawsuit[s] can be interpreted to raise ... a stand alone challenge [to the validity of the regulations], it is barred by the three-year statute of limitations."

In their reply brief, appellants attempt to clarify their position. They maintain that "[t]he 2004 RIF is an important basis of [their] standing to challenge the Board of Education's RIF regulations[,] ... [b]ut in this appeal, [they] are challenging only the [trial] court's rulings pertaining to the lawfulness of the regulations DCPS followed in the 2004 RIF, not the lawfulness of the application of those regulations." According to appellants, even though "the regulations were unlawful from their inception, it was their actual application that caused the injury necessary to give [them] standing to justify suit." They state that "[w]ithout such injury, [they] likely would have lacked standing to challenge the validity of the regulations, and any such challenge would not have been ripe for review." They contend that their lawsuits are timely because "[i]t was not until 2002 that DCPS issued regulations that could and did apply to the 2004 abolishment."

Like the trial court, we reject appellants' attempt to circumvent the possibility of OEA jurisdiction through a re-configuration of their complaints. The reconfiguration ignores Count I, alleging the denial of one round of lateral competition, as well as that part of appellants' prayer for relief pertaining to the denial of one round of lateral competition and the "make whole" remedy for the affected employees. The trial court properly read appellants' complaints as principally encompassing more than an allegation relating to the validity of the reduction-in-force regulations.[9] As we note later in this opinion, without

9. During the hearing, the following exchange occurred between appellants' counsel and the trial court:

Counsel: Our claim is that the regulations are incorrect ...

Court: I'm sorry. I don't read your complaint that way. I'm quoting from Count I ... [of the] complaint[s] ...: "DCPS and the [S]uperintendent violated 1–624.08 subsection [d] of the CMPA ..., by conducting

an abolishment of approximately 26 union[-]represented employees and denying one round of lateral competition ...."

Counsel: That's right .... But the Office of Employee Appeals, as you read, their jurisdiction is limited to the proper application of a process. We're saying there's no valid process to be applied one way [or] the other ....

Count I, appellants' claims probably would not be justiciable.

We turn now to the applicable legal principles. "[W]here, [as here,] the matter under review requires invocation or declaration of a fact-free general principle of law, the court will designate the issue as a question of law, and review the matter 'de novo.'"[10] Moreover, "if a 'substantial question' exists as to whether the CMPA applies, the Act's procedures must be followed, and the claim must initially be submitted to the appropriate District agency"; and "the determination whether the OEA has jurisdiction is quintessentially a decision for the OEA to make in the first instance."[11] That decision is conferred on OEA because of its specialty in personnel matters.

At the time of its creation, the Council described the OEA as "an independent personnel appeals authority which will hear all personnel-related employee appeals."[12] After examining the legislative history of the CMPA and its provisions, we said: "It would seem ... from the purpose and text of CMPA, including its judicial review provisions, that the Council 'plainly intended' CMPA to create a mechanism for addressing virtually every conceivable personnel issue among the District, its employees, and their unions—with a reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum."[13] We further determined that CMPA was designed to provide "exclusive remedies for claims arising out of employer conduct in handling personnel ratings, employee grievances, and adverse actions."[14] Subsequently, we said more broadly: "The [OEA] has exclusive appellate jurisdiction over claims against the District arising under the CMPA."[15]

Yet, our decisions also have been guided by the principle which presumes judicial reviewability of agency actions, especially where employees still enjoy certain common law rights to sue for injuries.[16] Hence, "the actions of government agencies are normally presumed to be subject to judicial review unless [the legislature] has precluded review or a court would have no law to apply to test the legality of the agency's actions."[17] The two main exceptions to this principle are: "First, the legislature may commit the challenged action entirely to agency dis-

---

**10.** *Davis v. United States,* 564 A.2d 31, 35 (D.C.1989).

**11.** *Armstead v. District of Columbia,* 810 A.2d 398, 400 (D.C.2002) (quoting *Grillo v. District of Columbia,* 731 A.2d 384, 386 (D.C.1999) and *Taggart–Wilson v. District of Columbia,* 675 A.2d 28, 29 (D.C.1996)) (internal quotation marks omitted); *see also White v. District of Columbia,* 852 A.2d 922, 926 (D.C.2004).

**12.** *District of Columbia v. Thompson,* 593 A.2d 621, 633–34 (D.C.1991) (citing Council of District of Columbia, District of Columbia Comprehensive Merit Personnel Act of 1978, Comm. Report on Bill No. 2–10, 24 (July 5, 1978, [Committee Report])).

**13.** *Thompson, supra* note 12, 593 A.2d at 634.

**14.** *Id.* at 635.

**15.** *Grillo, supra* note 11, 731 A.2d at 385.

**16.** " '[P]ublic employees do not lose their common law rights to sue for their injuries ... [when] neither those injuries nor their consequences trigger the exclusive provisions of the CMPA.' " *Id.* (quoting *King v. Kidd,* 640 A.2d 656, 664 (D.C.1993)).

**17.** *District of Columbia v. The Sierra Club,* 670 A.2d 354, 358 (D.C.1996) (citing *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 398 (D.C.1991) (quoting *Carlin v. McKean,* 262 U.S.App. D.C. 212, 214, 823 F.2d 620, 622 (1987), *cert. denied,* 484 U.S. 1046, 108 S.Ct. 784, 98 L.Ed.2d 870 (1988))) (internal quotation marks omitted).

cretion. Second, it may preclude review, explicitly or implicitly, by statute."[18]

▮▮▮▮ Statutory provisions in the CMPA are relevant to our determination as to whether the presumption of judicial reviewability applies to the matter before us, as to whether OEA must first confirm and then exercise initial jurisdiction, and as to which statutory procedures apply to the 2004 RIF at issue here. In construing statutes, "[w]e look to the plain meaning of the statute first, construing words according to their ordinary meaning."[19] "The literal words of [a] statute, however, are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice."[20] In addition where, as here, "divers statutes relate to the same thing, they ought . . . to be taken into consideration in construing any one of them . . . ."[21] Thus, "[i]f related statutes conflict, we must reconcile them."[22] Our statutory review is *de novo*.[23]

▮▮▮▮ We begin our analysis with the Board's RIF resolution and the statutory framework. The Board's May 11, 2004 resolution authorized the 2004 RIF at issue here for budgetary reasons, that is, to ensure balanced budgets rather than deficits in Fiscal Years 2004 and 2005; to "maintain fiduciary responsibility"; and to "address and eliminate a longstanding structural budgetary problem," traceable to declining enrollment of pupils and the administrative impact of that decline. Therefore, the 2004 RIF triggered the Abolishment Act provisions, D.C.Code § 1–624.08. The procedures established in § 1–624.08 appear to have governed that RIF, rather than the regular RIF procedures found in D.C.Code § 1–624.02 which were then applicable to the Educational Service pursuant to § 1–624.02(a). Section 1–624.02 contained more extensive procedures than those in § 1–624.08. The ordinary and plain meaning of the words used in § 1–624.08(c) appears to leave no doubt about the inapplicability of § 1–624.02 to the 2004 RIF:

> Notwithstanding any rights or procedures established by any other provision of this subchapter [that is, subchapter 24, which includes both § 1–624.02 and § 1–624.08], any District government employee, regardless of date of hire, who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as provided in this section.

Similarly, unlike § 1–624.02, § 1–624.08 plainly limited the procedures to which an affected employee is entitled; these include (1) in subsection (d) "one round of lateral competition . . . limited to positions in the employee's competitive level"; (2) in subsection (e) "written notice of at least 30 days before the effective date of his or her

18. *The Sierra Club, supra* note 17, 670 A.2d at 358 (citing *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)).

19. *Boyle v. Giral,* 820 A.2d 561, 568 (D.C. 2003) (citing *J. Parreco & Son v. Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989)).

20. *Boyle, supra* note 19, 820 A.2d at 568 (quoting *District of Columbia v. Gallagher,* 734 A.2d 1087, 1091 (D.C.1999)) (other citation and internal quotation marks omitted).

21. *Boyle, supra* note 19, 820 A.2d at 568 (quoting *Luck v. District of Columbia,* 617 A.2d 509, 514 (D.C.1992)) (other citation and internal quotation marks omitted).

22. *Boyle, supra* note 19, 820 A.2d at 568 (citing *Gonzalez v. United States,* 498 A.2d 1172, 1174 (D.C.1985)).

23. *Kingman Park Civic Ass'n v. Williams,* 924 A.2d 979, 983 (D.C.2007).

separation"; and (3) in subsection (h) "rights under either the Agency Reemployment Priority Program or the Displaced Employee Program[ ] ...." Furthermore, again unlike § 1–624.02, § 1–624.08(f) generally prohibited review of the employee's separation, but carved out two areas for exception, one of which is relevant here. Subsection (f)(2) provided, in essence, that if an affected employee wished to challenge the separation procedures of subsections (d) and (e), as applied, the employee could file an appeal with OEA:

> (f) Neither the establishment of a competitive area smaller than an agency, nor the determination that a specific position is to be abolished, nor separation pursuant to this section shall be subject to review except that:
>
> . . . .

(2) An employee may file with the Office of Employee Appeals an appeal contesting that the separation procedures of subsections (d) and (e) were not properly applied.

■■■■ The critical question raised by this litigation is whether appellees correctly applied the statutory procedures governing a RIF under the Abolishment Act. The procedures governing the 2004 RIF conducted by appellees appear to be explicitly set forth in § 1–624.08, and appellants' complaint seeks specific relief for employees affected by the 2004 RIF.[24] Those procedures include one round of lateral competition and proper written notice, and the procedures do not affect a separated employee's rights under the Reemployment Priority Program and the Displaced Employee Program. When ex-

**24.** As appellants recognize, they are dependent upon Count I to make their claim justiciable. Although this Court is an Article I rather than an Article III court under the Constitution, "we nonetheless apply in every case the constitutional requirement of a case or controversy and the prudential prerequisites of standing." *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1206 (D.C.2002) (citations and internal quotation marks omitted). Without Count I, appellants' claims would be subject to dismissal for lack of ripeness because they no longer would have a live, concrete controversy. As the Court said in *National Park Hospitality Ass'n v. Department of the Interior,* 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003):

> Absent [a statutory provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action "ripe" for judicial review ... until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him [or her].

See also *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 732–33, 118 S.Ct. 1665,

140 L.Ed.2d 921 (1998) ("the ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies ....' ") (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Appellants claims also might be subject to dismissal on standing grounds for lack of an injury in fact. See *Friends of Tilden Park, Inc., supra* note 24, 806 A.2d at 1206–07 ("The *sine qua non* of constitutional standing to sue is an actual or imminently threatened injury that is attributable to the defendant and capable of redress by the court. The plaintiff, or those whom the plaintiff properly represents, must have suffered an injury in fact ....") (citation and internal quotation marks omitted); see also *York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n,* 856 A.2d 1079, 1084 (D.C.2004) (" 'We have ... held that an injury amounting only to the alleged violation of a right to have the Government act in accordance with law was not judicially cognizable [under the requirements of Article III].' ") (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 575–76, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); see also *Riverside Hosp. v. District of Columbia Dep't of Health,* 944 A.2d 1098, 1104 (D.C.2008).

amined and read together, it is possible to reconcile the provisions of §§ 1–624.02 and 1–624.08 in chapter 24 of the CMPA, relating to reductions-in-force, with § 1–608.01a (b)(2)(L)(i) in chapter 8–A of the CMPA, concerning the Educational Service and rulemaking governing specified reduction-in-force procedures. Sections 1–624.02 and 1–608.01a (b)(2)(L)(i) are closely related in material substance; they both embody broader RIF procedures than those found in the Abolishment Act, § 1–624.08. Rulemaking for an Abolishment Act RIF is not essential because, as the trial court recognized, all of the material RIF procedures are encompassed within § 1–624.08. With respect to the procedures which might require more technical knowledge, Congress provided as a point of reference Chapter 24 of the Personnel Manual, not because that chapter is generally applicable to the Educational Service (it is not), but because it not only defines "one round of competition," (§ 2499.1) but also explains competitive levels and how they are established (§§ 2410 and 2411), as well as provides information regarding an agency Reemployment Priority Program (§§ 2427 and 2428) and a Displaced Employee Program (§§ 2429 and 2430).

The area of lateral competition involves specialized considerations for which there are no judicially manageable standards relating to competitive levels.[25] However, "the independent personnel appeals authority," OEA, has specialized expertise and experience in such matters. Undoubtedly, this is why § 1–624.08(f)(2) provides for a permissible appeal to the OEA with respect to challenges pertaining to subsection (d), and why that section does not mention the trial court as an appropriate initial forum. Given the specialized nature of the personnel issues presented by appellants in their respective complaints, the District's courts are best suited for "a reviewing role" and not as an "alternative forum" to an agency with specialized expertise.[26] Indeed, in a RIF case on which appellants rely, appellant filed his appeal with OEA in the first instance, and then sought review in the trial court.[27]

■■ In sum, we hold that appellants must present their claims in the first instance to OEA, the independent, specialized agency established to handle "all personnel-related employee appeals."[28] If OEA confirms its jurisdiction over appellants' claims, it should then proceed to resolution of the merits of those claims. In addition, we hold that the Abolishment Act procedures appear to apply to the 2004 RIF, rather than the general RIF provisions of the CMPA. We also conclude that

25. See The Sierra Club, supra note 17, 670 A.2d at 358.

26. See Lattisaw v. District of Columbia, 905 A.2d 790, 793 (D.C.2006); Thompson, supra note 12, 593 A.2d at 634.

27. Anjuwan v. District of Columbia Dep't of Pub. Works, 729 A.2d 883 (D.C.1998). There we sustained OEA's finding that the RIF was lawful, and its determination that appellant failed to demonstrate that the RIF was a pretext to retaliate against him for statutorily protected whistle blowing activities. Id. at 884–85. In passing, we observed that "[t]he OEA's authority is narrowly prescribed"; that it "does not have authority to determine broadly whether the RIF violates any law[,]" or "authority ... to enforce all laws and regulations including [a] consent decree ...." Id. at 885. That observation was traceable to appellant's contention in Anjuwan that "the RIF violated a consent decree entered into between the EPA and the District of Columbia." Id. We wanted to make clear that OEA's jurisdiction did not extend broadly to enforcing consent decrees, in that case a consent decree between a federal governmental agency and the District of Columbia government.

28. Thompson, supra note 12, 593 A.2d at 633–34; D.C.Code § 1–624.08(f)(2).

rather than dismissing the appellants' complaints, the trial court should have stayed its proceedings and transferred the case to the OEA for a determination of OEA's jurisdiction, and for initial resolution of appellants' claims, assuming confirmation of its jurisdiction.[29]

Accordingly, we vacate the trial court's order of dismissal and remand the case to the trial court for a stay of proceedings and a transfer of the matter to the OEA.

*So ordered.*

---

**29.** *See Grillo, supra* note 11, 731 A.2d at 387 ("trial judge's dismissal of the action was premature, for the suit may proceed if the OEA concludes that it lacks jurisdiction"). Appellees alternative argument, that the three-year statute of limitations would be a bar if appellants' complaints are entertained only as challenges to the validity of the regulations, should be made to the OEA, if appellants present their claims in that posture.