# District of Columbia
# Court of Appeals

**No. 14-CV-312**



FILED

JAN **21** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

BOARD OF TRUSTEES OF
      THE UNIVERSITY OF THE DISTRICT OF COLUMBIA,
                                 Appellant,

    v.                                            **CAB-7024-13**

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
      EMPLOYEES, DISTRICT COUNCIL 20, LOCAL 2087,
                                 Appellee.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE: Washington, Chief Judge; Fisher, Associate Judge; and Ruiz, Senior Judge.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the decision of the trial court is reversed, as the educational service employees of the University of the District of Columbia ("UDC") are subject to the requirements of the Abolishment Act[1] ("Act"), and the proper forum for challenging UDC's conduct of the reduction-in-force ("RIF") is the Office of Employee Appeals ("OEA").

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: January 21, 2016.

Opinion by Chief Judge Eric T. Washington.

---

[1] D.C. Code § 1-624.08 (2012 Repl.)

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

FILED 1/21/16
District of Columbia
Court of Appeals

*Julio Castillo*
Clerk of Court

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-312

BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA, APPELLANT,

V.

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 20, LOCAL 2087, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CAB-7024-13)

(Hon. Craig Iscoe, Trial Judge)

(Argued May 27, 2015                    Decided   January 21, 2016 )

*Gary L. Lieber*, with whom *Anessa Abrams* was on the brief, for appellant.

*Brenda C. Zwack*, with whom *Michael T. Anderson* and *Rianna N. Barrett* were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and RUIZ, *Senior Judge*.

WASHINGTON, *Chief Judge*:   Appellant, the Board of Trustees of the

University of the District of Columbia ("UDC"), challenges a decision of the trial

court denying its motion to stay an arbitration concerning a grievance that appellee,

the American Federation of State, County and Municipal Employees, District Council 20, Local 2087 (the "Union"), filed against UDC for implementing a reduction-in-force ("RIF") of its unionized educational service employees in violation of the parties' collective bargaining agreement ("CBA"). Specifically, UDC argues that the trial court erred in denying the stay because the RIF is governed by the Abolishment Act, D.C. Code § 1-624.08 (2012 Repl.), ("Abolishment Act" or the "Act"), and not by the parties' CBA. We agree and reverse.

## I.

On January 23, 2012, UDC implemented a RIF pursuant to the Abolishment Act that resulted in the elimination of sixty-nine faculty and staff positions for budgetary and financial reasons. Forty-six of those positions were held by individuals represented by the Union. Of those positions, thirty were in educational service. The Union filed a grievance on February 19, 2013, alleging that UDC failed to follow, *inter alia*, Article 30 of the CBA governing RIFs, arguing that the Act does not apply to UDC's educational service employees. On March 5, 2013, UDC declined to arbitrate the grievance arguing that the applicable conditions for conducting a RIF were governed by Title 24 of the Comprehensive

Merit Personnel Act ("CMPA") and not by contract. Further, UDC rejected arbitration contending that any challenge to the RIF had to be brought before the Office of Employee Appeals ("OEA"), because it has exclusive jurisdiction over the conduct of any RIF. On or about April 17, 2013, the Union filed a Demand for Arbitration with the American Arbitration Association. UDC responded that the grievance was not arbitrable and that any arbitration decision to the contrary would be *ultra vires*.

Subsequently, on October 17, 2013, UDC filed a Motion to Stay Arbitration in Superior Court. The trial court denied UDC's motion, reasoning that the grievance was arbitrable because UDC's educational service employees were not subject to the provisions of Title 24 of the CMPA. Further, the trial court concluded that, even if the Abolishment Act applied, the OEA did not have jurisdiction to hear the matter because the challenge was brought by a union and not by an individual employee. Thus, the trial court denied UDC's motion concluding that arbitration was appropriate because it was the only process that would guarantee due process for the affected employees. UDC now appeals.

## II.

We must first decide whether this appeal is properly before us. This appeal comes to us from a trial court order denying a motion to stay arbitration. Under the statute governing the jurisdiction of this court, however, only orders *granting* such motions are generally appealable as interlocutory orders. *See* D.C. Code § 16-4427. Nevertheless, we are satisfied that the instant matter is properly before us because the trial court resolved every issue that was raised in UDC's motion to stay the arbitration, *see Galloway v. Clay*, 861 A.2d 30, 32 (D.C. 2004), and because the trial court included a "CASE CLOSED" notation at the end of its order. We interpret that notation as an indication that the trial court believed that its order in this case was a final order and that there was nothing left for it to do in this case but execute its order. *See* D.C. Code § 11-721 (a)(1) ("[This court] has jurisdiction of appeals from all final orders and judgments of the Superior Court of the District of Columbia . . . ."); *see also Galloway*, 861 A.2d at 32 (noting that an order is final if it resolves the entire case on its merits such that there is nothing left for the trial court to do but to execute the judgment or decree already rendered). Thus, under the circumstances here, we are persuaded that we have jurisdiction to consider the appeal in this matter.

**III.**

UDC contends that the trial court abused its discretion in denying the motion to stay arbitration because, as a matter of law, educational service employees are covered by the Abolishment Act. More specifically, UDC argues that the plain language of the Act makes it clear that it was intended to apply to all employees of the District, including educational service employees, and that its provisions supersede any RIF procedures that might have been part of any pre-existing collective bargaining agreement.

The Union counters that the trial court did not err because Title 2 of the CMPA specifically exempts educational service employees from the RIF provisions of Title 24 and, therefore, any RIF involving those employees has to be conducted in accordance with the arbitration provisions of Article 30 of the CBA. Further, the Union contends that interpreting the Act as governing its claims under the CBA would effectively prevent the employees aggrieved by the RIF from having the opportunity to challenge the RIF procedures because the OEA, the District agency tasked with the responsibility of ensuring compliance with the Act, has already rejected the idea that challenges to RIFs brought by unions on behalf of represented employees are properly within its jurisdiction to address.

Whether a particular dispute is arbitrable is a question that the trial court must ultimately decide as a matter of law. *Haynes v. Kuder*, 591 A.2d 1286, 1289 (D.C. 1991) (citations omitted). Accordingly, this court reviews that determination, like any question of law, *de novo*. *Id.* In this case, the question regarding whether the RIF is subject to arbitration under the CBA turns on whether the Act's broad "notwithstanding clause" renders unenforceable those provisions of the CBA that are inconsistent with its provisions. In making that determination, we first look to the language of the statute. "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Varela v. Hi–Lo Powered Stirrups, Inc.*, 424 A.2d 61, 64-65 (D.C. 1980) (en banc) (quoting *United States v. Goldenberg*, 168 U.S. 95, 102-03 (1897)). When interpreting the language of a statute, we must look to the plain meaning if the words are clear and unambiguous. *District of Columbia v. District of Columbia Office of Emp. Appeals*, 883 A.2d 124, 127 (D.C. 2005) (citing *Jeffrey v. United States*, 878 A.2d 1189, 1193 (D.C. 2005)). Usually "[w]hen the plain meaning of the statutory language is unambiguous, the intent of the legislature is clear, and judicial inquiry need go no further." *District of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C. 1999) (citations omitted).

However, "a court may refuse to adhere strictly to the plain language of a statute in order 'to effectuate the legislative purpose' as determined by a reading of the legislative history or by an examination of the statute as a whole." *Peoples Drug Stores v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (en banc) (citations omitted). "[E]ven where the words of a statute have a 'superficial clarity,' a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve." *Id.*; "[W]ords are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history . . . ." *Id.* (quoting *Harrison v. Northern Tr. Co.*, 317 U.S. 476 (1943)); *Jeffrey*, 878 A.2d at 1193 ("The literal words of [a] statute . . . are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice.") (quoting *Columbia Plaza Tenants' Ass'n v. Columbia Plaza L.P.*, 869 A.2d 329, 332 (D.C. 2005)). With these principles in mind, we review the statutory provisions at issue.

**IV.**

Enacted in 1978, Title 2 of the District's Comprehensive Merit Personnel Act ("CMPA") specifically provides that educational service employees are exempt from the provisions of Title 24 of the CMPA, which governs RIFs. *See* Comprehensive Merit Personnel Act of 1978, D.C. Code § 1-602.03 (b) (2012 Repl.) ("educational employees shall not be covered by subchapter[] . . . XXIV of this chapter."). However, in 1996, Congress amended the CMPA to provide the District with greater flexibility to manage its workforce and control costs by giving it the authority to conduct RIFs "notwithstanding any other provision of law, regulation, or collective bargaining agreement . . . ." D.C. Code § 1-624.08 (a). That legislation, also known as the Abolishment Act, establishes the process that is to be used to accomplish any government RIF and vests in the OEA the exclusive jurisdiction to handle employee appeals if there is a challenge to the conduct of any RIF. *Id.* § 1-624.08 (b)-(e), (f)(2). The codifiers of the legislation placed the Abolishment Act within Title 24 of the CMPA.

UDC does not dispute that the plain language of Title 2 of the CMPA exempts educational service employees from the coverage of Title 24 of the same statute. Instead, UDC contends that the subsequently enacted Abolishment Act

has broad applicability because of its "notwithstanding" provision, thus rendering the prior exemption for educational service employees contained in Title 2 meaningless. We agree that the notwithstanding clause creates some ambiguity concerning the applicability of the Act to this particular group of employees and, therefore, we must look beyond the plain meaning of the words of the statute to ascertain congressional intent with respect to the scope of the Abolishment Act's coverage. Specifically, we must analyze congressional intent with respect to § 1-624.08 (a), which requires examination of the statute as a whole.

D.C. Code § 1-624.08 (a) states:

> Notwithstanding any other provision of law, regulation, or collective bargaining agreement either in effect or to be negotiated while this legislation is in effect for the fiscal year ending September 30, 2000, and each subsequent fiscal year, each agency head is authorized, within the agency head's discretion, to identify positions for abolishment.

A broad "notwithstanding clause" like that included in Title 24 of the CMPA "customarily evidences an intention of the legislature that the enactment control in spite of any earlier law to the contrary addressing the subject." *Leonard v. District of Columbia*, 794 A.2d 618, 626 (D.C. 2002) (citing *Poole v. Kelly*, 954 F.2d 760, 763 (D.C. Cir. 1992)). In other words, when scrutinizing conflicts between the terms of any newly enacted legislation containing a "notwithstanding"

clause, and any prior enacted legislation, the newly enacted legislation generally controls. Fairly recently, we had occasion to address a similar argument in *E.C. v. RCM of Washington, Inc.*, 92 A.3d 305 (D.C. 2014). In that case, we were called upon to determine whether the language "notwithstanding any other provision of this subchapter" set forth in D.C. Code § 51-131 (a), which was enacted to allow victims of domestic violence to receive unemployment compensation, superseded the statutory provision under which claimants may be disqualified for unemployment compensation based on gross and simple misconduct. We held that the plain language of D.C. Code § 51-131 unambiguously overrides any conflicting provision within the same subchapter, which covers eligibility for, and disqualification from, unemployment compensation benefits. *E.C.*, 92 A.3d at 315. Likewise, in *Burton v. Office of Emp. Appeals*, 30 A.3d 789, 796 (D.C. 2011), we held that the use of a "notwithstanding" clause clearly signaled the drafter's intention that the provisions of the notwithstanding section override conflicting provisions of any other section.

We see no reason to depart from such reasoning in this case. Congress's use of the phrase "notwithstanding any other provision of law, regulation or collective bargaining agreement" in this later enacted legislation makes clear its intention to remove all legal impediments to the government's ability to conduct RIFs under

the Act. To interpret this language more narrowly, as the Union suggests we should, would put this opinion in direct conflict with our prior decision in *Burton*, where appellants challenged the trial court's decision that they could be demoted without cause under the Metropolitan Police Personnel Amendment Act ("MPPA"). In affirming the trial court's decision in that case, we interpreted a provision of the MPPA intended to confer authority on the mayor or his delegee to return assistant chiefs of police and inspectors to the rank of captain, "notwithstanding" any other law or regulation, to mean that the provision "at a minimum[ ] . . . supersede[d] any conflicting regulations that were in place at the time the statute was enacted." *Id.* at 795.

In response, the Union argues that while there may not be any specific language in Title 24 exempting educational service employees from the coverage of the Act, the placement of the Act within Title 24 and Congress's recognition in other parts of the CMPA that educational service employees are a special class within the District's employ supports the trial court's interpretation that the Act was not intended to include this favored group of employees within its coverage.

The appellants in *Burton* made a similar argument contending that interpreting the MPPA as conferring broad authority on the Chief of Police to

return assistant chiefs of police and inspectors to the rank of captain would eviscerate strong protections granted under the CMPA to Career Service employees, which the MPPA amended. We concluded that the "notwithstanding" clause clearly indicated the legislature's intent to override any other conflicting provision. *Id.* at 796 (referencing *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) in its rationale to return assistant chiefs of police and inspectors to the rank of captain).

This interpretation is also consistent with the purpose behind the enactment of the Act, and specifically the need to address budgetary concerns that may result in a RIF. *See Washington Teachers' Union, Local #6 v. District of Columbia Public Schools*, 960 A.2d 1123, 1125 (D.C. 2008) ("We further hold . . . that the Abolishment Act procedures, imposed for budgetary reasons, appear to apply to the 2004 RIF . . . .").

First, it is undisputed that the Act was passed to provide the District with what Congress considered to be a critical tool, not only for addressing its then ongoing financial crisis, but also to better manage its finances in the future. *See Washington Teachers' Union Local No. 6, Am. Fed. of Teachers, AFL-CIO v. Board of Educ. of the District of Columbia*, 109 F.3d 774, 777 (D.C. Cir. 1997). It

sought to accomplish this goal by giving the District the authority to conduct reductions in force as it deemed necessary without having to comply with any contractual and/or other legal impediments that were in place prior to the law's enactment. *See id.* at 779 ("Congress is not subject to the Contract Clause, even when legislating for the District."). Because the language used in the Act to establish its primacy over all other laws is as broad as any that Congress has ever used, it is difficult to fathom that Congress intended to exempt any District employees from its coverage.

Our interpretation of the coverage of the Act is further bolstered by the fact that Congress clearly knew how to distinguish UDC's educational service employees from other employees if it was their intent to do so. Title 2 is a good example of clear Congressional intent to treat educational service employees differently. *See* D.C. Code § 1-601.02 (a)(3) ("[I]t is the purpose and policy of this chapter to assure that the District of Columbia government shall have a modern flexible system of public personnel administration, which shall . . . [c]reate separate personnel management systems for educational employees of . . . the University of the District of Columbia."); D.C. Code § 1-602.02 (4) (limiting application of the chapter as to UDC's educational employees, which are to be governed by § 1-602.03 of the CMPA). In this instance, no language excluding

educational service employees from the coverage of the Abolishment Act can be found in the Act and we have been unable to find any legislative history that would lead us to conclude that Congress did not intend to include educational service employees within the Abolishment Act's coverage.

Similarly, the Union's reliance on our prior decision in *Davis v. University of the District of Columbia*, 603 A.2d 849 (D.C. 1992), as support for its argument that Congress intended to exempt educational service employees from the reach of the Abolishment Act is unpersuasive. *Davis* was decided in 1992, prior to the enactment of the Act in 1996 and, therefore, it is of little help in ascertaining whether Congress intended for the Act to apply to educational service employees. In fact, the case does nothing more than provide further support for the already acknowledged proposition that, prior to passage of the Abolishment Act, educational service employees were not subject to the same employment rules as other District employees.

The Union's most persuasive argument is that the placement of the Act within Title 24 of the CMPA reflected Congress's intent to exempt educational service employees from its reach because Congress was well aware that Title 2 of the CMPA specifically exempted educational service employees from Title 24's

coverage. However, the fact that the District's codifiers placed the Abolishment Act within Title 24, without more, is hardly indicative of Congress's intent with respect to whether educational service employees were to be excluded from the coverage of the Abolishment Act and does not undermine our analysis evincing a contrary congressional intent. *Cf. United States v. Young*, 376 A.2d 809, 813 (D.C. 1977) (disregarding codifiers' placement of threats statute in D.C. Code in light of legislative history evincing contrary congressional intent).

In fact, and contrary to the Union's argument, it appears that Congress actually intended for the Act to be placed at the end of the CMPA, as opposed to being made part of Title 24, *see, e.g.*, Pub. L. No. 104-194, § 140(b), 110 Stat. 2356, 2372-73 (directing Abolishment Act to be placed "at the end" of the CMPA, which is Title 36); Pub. L. No. 105-100, § 150(d), 111 Stat. 2160, 2183 (same). While not determinative of whether Congress intended for educational service employees to be exempt from its coverage, the fact that Congress expressly indicated that the Act should be placed somewhere other than within Title 24 tends to undermine the Union's argument that the drafters of the bill specifically intended for the Act not to apply to educational service employees.

UDC's interpretation of the Act's coverage is further supported by the fact that Congress clearly knew how to draft more limited "notwithstanding" clauses than the one that was used in § 1-624.08 (a) of the CMPA. *Compare* D.C. Code § 1-624.08 (a) "Notwithstanding *any other provision of law, regulation, or collective bargaining agreement . . .,*" *with* D.C. Code § 1-624.08 (c) "Notwithstanding any rights or procedures established by any other provision *of this subchapter . . .*" (emphasis added). Given the broad language contained in the "notwithstanding clause" of subsection (a) of the Act, the fact that the Act was passed subsequent to the passage of Title II and yet did not contain any special exception for educational service employees, the Act's purpose of addressing the District's budgetary problems, and the legislative history of the Act that clearly indicates that the Act's placement in Title 24 was not intended by Congress, we are satisfied that Congress did not specifically intend to exempt educational service employees from the coverage of the Act. Therefore, the trial court erred in interpreting the statute as exempting educational service employees from the reach of the Act.

**V.**

Having concluded that educational service employees are covered by the Act, we must now address the Union's claim that the employees whom they represent must be able to submit their claims to arbitration because the OEA has declined to consider union challenges to government RIFs under the Abolishment Act. While we generally defer to a District agency's interpretation of its governing statute, the Act unambiguously vests the OEA with the exclusive jurisdiction to determine whether the District government acted properly in conducting a RIF. *See* D.C. Code § 1-624.08 (f)(2). Thus, to the extent that OEA believes that it is without jurisdiction to hear and resolve employee challenges to a government RIF under the Act simply because the employee is represented by a union, such an interpretation is contrary to the plain language of the statute. In fact, nothing in the Act prevents represented employees from challenging their separation from government service pursuant to a RIF and none of the parties to this appeal seriously dispute that fact. The fact that the educational service employees chose to collectively challenge the RIF by going to arbitration under the CBA, as opposed to under the Act, is not dispositive of whether they have a remedy under the Act. The Act provides that "an employee" may appeal a RIF to the OEA and nothing we have found would have precluded any of the employees within this

bargaining unit from challenging the District's decision to separate them from the government in a manner consistent with the provisions of Title 24. *See* D.C. Code § 1-624.08 (f). Therefore, these employees are not without a forum to challenge any violation of their rights that occurs as a result of the manner by which the District government conducts a RIF under the Act.

## VI.

In sum, we hold that UDC's educational service employees are subject to the requirements of the Act and that the proper forum for challenging UDC's conduct of the RIF is the OEA.

For the foregoing reasons, the decision of the trial court is

*Reversed.*