# District of Columbia
# Court of Appeals

**No. 14-CV-315**

VILEAN STEVENS & IKE PROPHET,

Appellants,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH,

Appellees.



F I L E D

DEC **15** 2016

**DISTRICT OF COLUMBIA
COURT OF APPEALS**

**CAP-3345-10**

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE: FISHER and THOMPSON, *Associate Judges*; and PRYOR, *Senior Judge.*

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment on appeal is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: December 15, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-315

FILED 12/15/16
District of Columbia
Court of Appeals

*Julio Castillo*
Julio Castillo
Clerk of Court

VILEAN STEVENS & IKE PROPHET, APPELLANTS,

V.

DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAP-3345-10)

(Hon. Joan Zeldon, Trial Judge)

(Argued October 4, 2016                    Decided December 15, 2016)

*David A. Branch* for appellants.

*Holly M. Johnson*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellee.

Before FISHER and THOMPSON, *Associate Judges*, and PRYOR, *Senior Judge*.

THOMPSON, *Associate Judge*:    Appellants Vilean Stevens and Ike Prophet appeal from a judgment of the Superior Court that affirmed decisions by the District of Columbia Office of Employee Appeals ("OEA") upholding the abolishment, through a reduction-in-force ("RIF"), of positions that appellants held at appellee District of Columbia Department of Health ("DOH" or the "Agency").

For the reasons that follow, we agree with the OEA (and with the Superior Court) that the RIF was governed by the Abolishment Act, D.C. Code § 1-624.08 (2006 Repl.) (sometimes hereafter referred to as the "Act"), rather than by the so-called general RIF statute, D.C. Code §§ 1-624.02 – .07 (2006 Repl.). We also conclude that substantial evidence supports the OEA's determination that DOH satisfied the procedural requirements of the Abolishment Act in implementing the RIF. We therefore affirm the judgment.

## I. Background

Until the RIF that is the subject of the parties' dispute, appellants worked in the Commodity Supplemental Food Program ("CSFP") of the DOH Community Health Administration, Nutrition and Physical Fitness Bureau.[1] By letter dated December 29, 2008, the Director of DOH sent each of the appellants a notice of separation by RIF. The letter stated that it "serve[d] as official notice of at least thirty (30) calendar days" that appellants would be separated from service effective January 30, 2009, "in accordance with Chapter 24 of the District's Personnel

---

[1] CSFP provides federal commodity food, nutrition education, and related services to pregnant and post-partum women, children under the age of six, and seniors over the age of sixty.

Regulations[.]"  The letter further informed appellants that, *inter alia*, they had a right to appeal to the OEA.

Appellants appealed to the OEA, contending that DOH (1) undertook the RIF pursuant to the general RIF statute, D.C. Code § 1-624.02, rather than pursuant to the Abolishment Act, D.C. Code § 1-624.08, and (2) did so without complying with the regulatory requirements applicable to RIFs conducted under the general RIF statute.  Appellants contended in addition that DOH's stated reason for the RIF — "[l]ack of [f]unds" — was contrived and a pretext for outsourcing. Appellants further contended that they were not provided one round of lateral competition.

In substantially identical initial decisions on appellants' appeals, the OEA concluded that its decision was "guided solely" by the Abolishment Act, which limited the issues appellants could bring to whether they were afforded the thirty days' prior written notice of separation required by the Act and whether each was afforded one round of lateral competition within his or her competitive level.  The OEA found that both appellants were properly afforded thirty days' written notice, that "the entire unit in which [appellants'] position[s were] located was abolished," and that DOH also "was in compliance with the lateral competition requirements

of the law." In addition, the OEA ruled that it lacked jurisdiction to determine whether the RIF was "bona fide or violated any [other] law."

Appellants sought review by the Superior Court, which consolidated their cases and affirmed the OEA's initial decisions in part and remanded in part. The court affirmed, as supported by substantial evidence, the OEA's determination that no lateral competition was required because appellants' "entire unit was RIFed." The court remanded the matter to the OEA, however, to explain "why the RIF fell within the Abolishment Act and not the general RIF provision." The court issued an amended order reasoning that the OEA "does have jurisdiction to consider the question of whether the RIF at issue was a sham" and expanding the scope of the remand for the OEA to consider "whether [appellants'] sham RIF arguments are frivolous or non-frivolous."

In an "Addendum Decision on Remand," the OEA ruled that it was "primarily guided" by the Abolishment Act for "RIFs authorized due to budgetary restrictions." It asserted that the Act "was enacted specifically for the purpose of addressing budgetary issues resulting in a RIF" and observed that the Act "is a more streamlined statute for use during times of fiscal emergency." Citing this court's decision in *Washington Teachers' Union*, *Local # 6 v. District of Columbia*

*Pub. Sch.* ("*WTU*"), 960 A.2d 1123 (D.C. 2008), the OEA noted this court's statement that the RIF involved in that case, which was implemented "to ensure balanced budgets," "triggered the Abolishment Act provisions." *Id.* at 1132. The OEA also reasoned that the "notwithstanding" language of the Act's third paragraph, D.C. Code § 1-624.08 (c) ("Notwithstanding any rights or procedures established by any other provision of this subchapter, any District government employee, regardless of date of hire, who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as provided in this section.") "suggests that [the Act] is the more applicable statutory provision in order to conduct RIFs resulting from budgetary constraints." Further, the OEA determined that appellants' "arguments relative to the instant RIF being a sham are FRIVOLOUS." It found that appellants had "failed to proffer any credible argument(s) or evidence that would indicate that the RIF was improperly conducted or implemented" and that there were no material facts in dispute warranting an evidentiary hearing. The Superior Court affirmed the OEA's Addendum Decision on Remand.

In the instant appeal, appellants contend that the RIF was not conducted due to a lack of funds or budgetary constraints and that the OEA therefore erred in concluding that the RIF was governed by the Abolishment Act rather than by the

procedural requirements of the general RIF statute and its implementing regulations. Appellants argue in the alternative that even if the cause of the RIF was a "budgetary concern," the OEA erred in assuming either (1) that the Abolishment Act replaced the general RIF statute, such that the Act governs all government agency RIFs, or (2) that any RIF undertaken because of a budgetary concern is an Abolishment Act RIF. Appellants contend that the OEA was required to consider the "intent and procedures used" in the RIF, factors that they assert show that the DOH RIF "was clearly intended to be conducted under the [general] RIF statute." Appellants also argue that the case should be remanded because the OEA failed to hold an evidentiary hearing and make factual findings resolving what they contend are material issues of disputed fact. Appellant Stevens argues in addition that the OEA erred in holding that there was no violation of the one-round-of-lateral-competition requirement. We address each of these claims in turn.

## II.  Applicable Law

### A.  This court's standard of review in OEA cases

This court "review[s] agency decisions on appeal from the Superior Court the same way we review administrative appeals that come to us directly." *Dupree*

*v. District of Columbia Dep't of Corr.*, 132 A.3d 150, 154 (D.C. 2016). "Thus, in the final analysis, confining ourselves strictly to the administrative record, we review the OEA's decision, not the decision of the Superior Court, and we must affirm the OEA's decision so long as it is supported by substantial evidence in the record and otherwise in accordance with law." *Id.* (internal quotation marks omitted). "Questions of law, including questions regarding the interpretation of a statute or regulation, are reviewed *de novo*." *Id.*

### B. The general RIF statute and the Abolishment Act

Both the general RIF statute, D.C. Code §§ 1-624.01 through 624.07, and the Abolishment Act, D.C. Code § 1-624.08, are found in Subchapter XXIV of the Comprehensive Merit Personnel Act ("CMPA"), entitled "Reductions-in-Force." The general RIF statute "embod[ies] broader RIF procedures than those found in the Abolishment Act[.]" *WTU*, 960 A.2d at 1134.

The general RIF statute authorizes the Mayor (and the District of Columbia Board of Education) to "issue rules and regulations establishing a procedure for the orderly . . . termination of employees[,]" D.C. Code § 1-624.01 (2006 Repl.), and sets out a list of RIF procedures. *Id.* § 1-624.02. The Mayor has adopted

implementing regulations that are set out in Chapter 24 of the District of Columbia Personnel Manual, 6B DCMR § 2400-99.[2]  6B DCMR § 2401.1 provides that each personnel authority is to follow these regulations "when releasing a competing employee from his or her competitive level when the release is required by . . . (a) [l]ack of work; (b) [s]hortage of funds; (c) [r]eorganization or realignment; or (d) [t]he exercise of restoration rights [in connection with homeless veterans reintegration programs]."

The Abolishment Act provides as follows:

---

[2]    As summarized by the OEA in its Addendum Decision on Remand, appellants contend that DOH failed to satisfy the procedural requirements of D.C. Code § 1-624.02 and its implementing procedural regulations "by not considering job sharing and reduced work hours and agency reemployment (6[B] DCMR 2403.2 and 2401.1); by not providing justification for a lesser competitive area than the Agency (6[B] DCMR 2409.3 (c)); by not providing a broader competitive level (6[B] DCMR 2410.4); and, by not providing a Retention Register after approval for the RIF (6[B] DCMR 2412)."

We note that the regulations implementing the general RIF statute also define certain terms used in the Abolishment Act.  As reflected in D.C. Code § 1-624.08 (d), in the Abolishment Act, "Congress provided as a point of reference Chapter 24 of the Personnel Manual, . . . because it not only defines [the term] 'one round of competition,' . . . but also explains competitive levels and how they are established . . . , as well as provides information regarding an agency Reemployment Priority Program . . . and a Displaced Employee Program[.]" *WTU*, 960 A.2d at 1134 (noting, too, that "[r]ulemaking for an Abolishment Act RIF is not essential because . . . all of the material RIF procedures are encompassed within § 1-624.08").

§ 1-624.08. Abolishment of positions for fiscal year 2000 and subsequent fiscal years.

(a) Notwithstanding any other provision of law, regulation, or collective bargaining agreement either in effect or to be negotiated while this legislation is in effect for the fiscal year ending September 30, 2000, and each subsequent fiscal year, each agency head is authorized, within the agency head's discretion, to identify positions for abolishment.

(b) Prior to February 1 of each fiscal year, each personnel authority (other than a personnel authority of an agency which is subject to a management reform plan under subtitle B of title XI of the Balanced Budget Act of 1997) shall make a final determination that a position within the personnel authority is to be abolished.

(c) Notwithstanding any rights or procedures established by any other provision of this subchapter, any District government employee, regardless of date of hire, who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as provided in this section.

(d) An employee affected by the abolishment of a position pursuant to this section who, but for this section would be entitled to compete for retention, shall be entitled to one round of lateral competition pursuant to Chapter 24 of the District of Columbia Personnel Manual, which shall be limited to positions in the employee's competitive level.

(e) Each employee selected for separation pursuant to this section shall be given written notice of at least 30 days before the effective date of his or her separation.

(f) Neither the establishment of a competitive area smaller than an agency, nor the determination that a specific position is to be abolished, nor separation

pursuant to this section shall be subject to review except that:

(1) An employee may file a complaint contesting a determination or a separation pursuant to subchapter XV of this chapter or § 2-1403.03; and

(2) An employee may file with the Office of Employee Appeals an appeal contesting that the separation procedures of subsections (d) and (e) were not properly applied.

(g) An employee separated pursuant to this section shall be entitled to severance pay in accordance with subchapter XI of this chapter, except that the following shall be included in computing creditable service for severance pay for employees separated pursuant to this section:

(1) Four years for an employee who qualified for veterans preference under this chapter, and

(2) Three years for an employee who qualified for residency preference under this chapter.

(h) Separation pursuant to this section shall not affect an employee's rights under either the Agency Reemployment Priority Program or the Displaced Employee Program established pursuant to Chapter 24 of the District Personnel Manual.

(i) With respect to agencies which are not subject to a management reform plan under subtitle B of title XI of the Balanced Budget Act of 1997, the Mayor shall submit to the Council a listing of all positions to be abolished by agency and responsibility center by March 1 of each fiscal year or upon the delivery of termination notices to individual employees.

(j) Notwithstanding the provisions of § 1-617.08 or § 1-624.02(d), the provisions of this chapter shall not be deemed negotiable.

(k) A personnel authority shall cause a 30-day termination notice to be served, no later than September 1 of each fiscal year, on any incumbent employee remaining in any position identified to be abolished pursuant to subsection (b) of this section.

(l) In the case of an agency which is subject to a management reform plan under subtitle B of title XI of the Balanced Budget Act of 1997, the authority provided by this section shall be exercised to carry out the agency's management reform plan, and this section shall otherwise be implemented solely in a manner consistent with such plan.

D.C. Code § 1-624.08.

While the permanent legislation known as the Abolishment Act had its origin in congressional legislation, the language of the Act first appeared in emergency and temporary legislation enacted by the Council of the District of Columbia ("the Council") in 1995 and 1996. 1995 was a year when "financial and management problems of the District government" had "adversely affected the long-term economic health of the District," *University of the District of Columbia Faculty Ass'n v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 618 (D.C. Cir. 1998) (internal quotation marks omitted). Beginning in August of that year, the Council passed several pieces of legislation that provided that "(a) Notwithstanding any other provision of law, regulation, or

collective bargaining agreement either in effect or to be negotiated while this legislation is in effect for the fiscal year ending September 30, 1996, each agency head is authorized, within the agency head's discretion, to identify positions for abolishment"; and that "(b) Prior to February 1, 1996, each personnel authority shall make a final determination that a position within the personnel authority is to be abolished."[3] Through the latter provision, the Council each time "set a deadline of February 1, 1996, for personnel authorities to make final decisions on the identification of positions to be abolished through a reduction in force[.]"[4]

In April 1996, Congress enacted the District of Columbia Appropriations Act of 1996 ("the 1996 Budget Act"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), "to deal with the District's financial crisis[.]" *Washington Teachers' Union Local # 6 v. Bd. of Educ.* ("*BOE*"), 109 F.3d 774, 776 (D.C. Cir. 1997). The 1996 Budget Act temporarily amended District law governing reductions-in-force by adopting provisions identical to those of the Council-enacted reduction-in-force

---

[3] *E.g.*, 42 D.C. Reg. 4219, 4238 (Aug. 11, 1995); 42 D.C. Reg. 4706, 4711 (Aug. 25, 1995); 42 D.C. Reg. 6181, 6186 (Nov. 10, 1995); 42 D.C. Reg. 6569, 6574 (Nov. 10, 1995).

[4] *See also* 42 D.C. Reg. at 4706; 42 D.C. Reg. at 6181; 42 D.C. Reg. at 6181; 42 D.C. Reg. at 6569.

legislation described above, except that the date before which each agency head was to make a final determination about positions for abolishment was changed from February 1, 1996, to August 1, 1996. *See* § 149 (b), 110 Stat. at 1321-98; *see also BOE*, 109 F.3d at 777. Congress enacted the temporary provision "to provide the District with greater flexibility to manage its workforce and control costs[.]" *Board of Trs. of Univ. of District of Columbia v. American Fed'n* ("*UDC*"), 130 A.3d 355, 359 (D.C. 2016); *see also Fowler v. District of Columbia*, 122 F. Supp. 2d 37, 38 (D.D.C. 2000) (explaining that "[o]perating deficits, cash shortages, management inefficiencies, deficit spending, and an overall 'fiscal emergency' led Congress to enact [the Abolishment Act]").

Thereafter, beginning in June 1996, and again in 1997, 1998, and 1999, both the Council and Congress passed legislation that updated the language of the reduction-in-force legislation. The Council added a new section, § 1-625.7, to the D.C. Code that tracked the language of the earlier legislation, but that changed the date in the opening paragraph from the phrase "for fiscal year ending September 30, 1996," to the phrase "for the fiscal year ending September 30, 1997," and also changed the succeeding paragraph to "set a deadline of February 1, 1997, for personnel authorities to make final decisions on the identification of positions to be abolished through a reduction in force[.]" 43 D.C. Reg. 4377, 4377 (Aug. 16,

1996); 43 D.C. Reg. 5427, 5427 (Oct. 11, 1996).  Congress passed appropriations legislation that contained identical changes.  *See* § 140 (b), 110 Stat. at 2373.

Thereafter, during each of the next three years, Congress passed appropriations legislation that continued the update process:  it substituted the phrase "for the fiscal year ending September 30, 1998," Pub. L. No. 105-100, § 150 (d), 111 Stat. 2160, 2183 (1997); the phrase "the fiscal year ending September 30, 1999," Pub. L. No. 105-277, § 144 (b), 112 Stat. 2681, 2681-144 (1998); and then the phrase "for the fiscal year ending September 30, 2000," Pub. L. No. 106-113, § 140 (b), 113 Stat. 1501, 1522 (1999), for the originally enacted phrase "for the fiscal year ending September 30, 1996," and it changed the date by which a final decision was to be made on the identification of positions to be abolished to February 1, 1998; then to February 1, 1999; and then to February 1, 2000.  *See* § 150 (d), 111 Stat. at 2183; § 144 (b), 112 Stat. at 2681-144; and § 140 (b), 113 Stat. at 1522.[5]

_____

[5]  Congress also made corresponding date adjustments in paragraphs (i) and (k) of the Act, specifying the dates (March 1, 1998; March 1, 1999; and March 1, 2000) by which the Mayor was to submit to the Council a listing of all positions to be abolished and the date by which termination notices were to be served.  § 150 (d), 111 Stat. at 2183-84; § 144 (b), 112 Stat. at 2681-144; § 140 (b), 113 Stat. at 1522.

In November 2000, Congress made (what is to date) its final amendment to the Abolishment Act, substituting the phrase "September 30, 2000, *and each subsequent fiscal year*" for the originally enacted phrase in subsection (a), and inserting, in subsection (b), "[p]rior to February 1 *of each year*" in lieu of February 1 of a specified year. *See* Pub. L. No. 106-522, § 129 (b), 114 Stat. 2440, 2467 (2000); Pub. L. No. 106-553, § 129 (b), 114 Stat. 2762, 2762A-29-30 (2000) (emphasis added). The Council subsequently amended the heading of the Act (which had been recodified as D.C. Code § 1-624.08) to read "Abolishment of positions for fiscal year 2000 and subsequent fiscal years" and also substituted the phrase "each fiscal year" for the phrase "each year" wherever it appeared. 52 D.C. Reg. 10637, 10645 (Dec. 9, 2005).

The permanent legislation described above added a new section (§ 1-625.7, later recodified as § 1-624.08) to Subchapter XXIV of the CMPA. None of the Council or congressional legislation described above repealed or amended the terms of the general RIF statute.

## C. Statutory construction principles

"The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (internal quotation marks omitted). This court therefore begins its process of statutory interpretation "by looking at the statute on its face, and if the meaning is clear from the face of the statute, we must give effect to that plain meaning." *Rupsha 2007, L.L.C. v. Kellum*, 32 A.3d 402, 406 (D.C. 2011). A "cardinal rule [of statutory construction is also] that a statute is to be read as a whole[.]" *Corley v. United States*, 556 U.S. 303, 314 n.5 (2009) (internal quotation marks omitted). "[O]ne of the most basic interpretive canons" is that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Id.* at 314 (internal quotation marks and brackets omitted); *see also Adgerson v. Police & Firefighters' Ret. & Relief Bd.*, 73 A.3d 985, 992 (D.C. 2013) ("It is a 'well-accepted tenet of statutory construction that, whenever possible, a statute should be interpreted as a harmonious whole.'" (quoting *In re T.L.J.*, 413 A.2d 154, 158 (D.C. 1980)); *Thomas v. District of Columbia Dep't of Emp't Servs.*, 547 A.2d 1034, 1037 (D.C. 1988) ("[E]ach provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.").

### III. Analysis

### A. The reach of the Abolishment Act

For the reasons that follow, we agree with appellants that the Abolishment Act did not supersede the general RIF statute and that a RIF may be governed by the general RIF statute and regulations rather than by the Abolishment Act even if it was based on budgetary constraints. We also conclude, however, that the Abolishment Act currently affords District of Columbia agencies an opportunity each fiscal year to use a streamlined procedure to abolish positions that they have identified before February 1 of the fiscal year, without regard to whether there is a fiscal emergency or budget crisis.

*1. The February 1 deadline for RIFs under the Abolishment Act*

We begin with the fact, emphasized by appellants, that "[t]he Abolishment Act did not state that it repealed the [general] RIF statute." As we have often observed, "repeals by implication are not favored." *Owens v. District of Columbia*, 993 A.2d 1085, 1088 (D.C. 2010) (internal quotation marks omitted) (quoting *Morton v. Mancari*, 417 U.S. 535, 549 (1974)). Our first task is therefore to determine whether the statutes involved here, the Abolishment Act and the general

RIF statute, can be harmonized and deemed to have "concurrent operation." *Mazanderan v. District of Columbia Dep't of Pub. Works*, 94 A.3d 770, 774, 781 (D.C. 2014).

We conclude that the two RIF statutes can be harmonized and that the general RIF statute has not been diminished by the Abolishment Act's "notwithstanding" clauses.[6] To be sure, this court has recognized that statutory

---

[6] *See* D.C. Code § 1-624.08 (a) ("Notwithstanding any other provision of law [or] regulation, . . . for the fiscal year ending September 30, 2000, and each subsequent fiscal year, each agency head is authorized, within the agency head's discretion, to identify positions for abolishment.") and (c) ("Notwithstanding any rights or procedures established by any other provision of this subchapter, any District government employee, regardless of date of hire, who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as provided in this section.").

Our conclusion that the Abolishment Act and the general RIF statute both continue in effect is not inconsistent with the analysis in *UDC*. We said there that the Abolishment Act "establishes the process that is to be used to accomplish any government RIF[.]" 130 A.3d at 359. Divorced from its context, that statement might be read to mean that the Act has entirely superseded the general RIF statute for *any* RIF a government agency undertakes. When the statement is read in context, however, it becomes clear that it means that the provisions of the Abolishment Act apply to the District's educational service employees (a category that includes UDC employees) just as they do to employees of any other District agency. The statement appears in a paragraph that explains that while the CMPA as originally enacted provided that "educational service employees are exempt from the provisions of Title 24 of the CMPA, which governs RIFs," the Abolishment Act amended the CMPA to give the District "greater flexibility to manage its workforce," by making the Act applicable to "any government RIF," *id.*

(continued…)

"notwithstanding" language "customarily evidences an intention of the legislature that the enactment control in spite of any earlier law to the contrary addressing the subject." *Leonard v. District of Columbia*, 794 A.2d 618, 626 (D.C. 2002); *see also UDC*, 130 A.3d at 360 (stating that the Abolishment Act's notwithstanding clause "makes clear [Congress's] intention to remove all legal impediments to the government's ability to conduct RIFs under the Act."). Nevertheless, in accordance with the principles of statutory construction discussed above, we are obligated to consider all of the statute's provisions, not just the "notwithstanding" clauses. Doing that, we discern that the language of § 1-624.08 (b) and its plain meaning are the key to understanding how the Abolishment Act operates in relation to the general RIF statute.

As already described, the Act states (in D.C. Code § 1-624.08 (b)) that "[p]rior to February 1 of each fiscal year, each personnel authority . . . shall make a final determination that a position within the personnel authority is to be abolished." As expressly stated by the Council in legislative preambles[7] (when it

---

(…continued)

— i.e., by making the Act applicable to educational service RIFs as well as other government RIFs. *Id.*

[7] *See Clement v. District of Columbia Dep't of Emp't Servs.*, 126 A.3d 1137, 1141 (D.C. 2015) (relying on purposes listed in bill preamble as evidence of

(continued…)

introduced the February 1 date in connection with RIFs to be implemented for the fiscal year ending September 30, 1996, or the fiscal year ending September 30, 1997), February 1 was the "*deadline . . .* for personnel authorities to make final decisions on the identification of positions to be abolished through a reduction in force[.]" *E.g.*, 43 D.C. Reg. at 5427 (emphasis added).[8]  Congress retained the reference to February 1 in the temporary updates it made to the Abolishment Act in 1996, 1997, 1998, and 1999, and in the amendment it made in 2000 to make the Act applicable "for the fiscal year ending September 30, 2000, and each subsequent fiscal year."

Given the foregoing history, we see no reason to think that the February 1 date as retained in the statute functions any differently than it did as originally enacted:  it is the annual deadline by which an agency must identify positions to be abolished through an Abolishment Act RIF.

_____

(…continued)
the Council's legislative intent); *Expedia, Inc. v. District of Columbia*, 120 A.3d 623, 636 (D.C. 2015) ("The preamble . . . confirmed [the Council's] purpose[.]").

[8]  *See* sources cited *supra* note 4; *see also* 43 D.C. Reg. 5, 5 (Jan. 5, 1996); 43 D.C. Reg. 777, 777 (Feb. 23, 1996); 43 D.C. Reg. at 4377.

To put it differently, we construe the "each subsequent fiscal year" language of § 1-624.08 (a) together with the "February 1" deadline of § 1-624.08 (b) to mean that the Abolishment Act establishes a once-per-fiscal-year,[9] time-limited opportunity[10] for each District of Columbia agency to effect a RIF to manage its operations and workforce.[11] This interpretation harmonizes the two RIF statutes on a basis that relies on the Abolishment Act's plain language without rendering the general RIF statute superfluous. It means, for example, that if an agency determines after February 1 of the fiscal year that a RIF during the fiscal year is

---

[9] *Cf. Horwitz v. Bankers Life & Cas. Co*., 745 N.E.2d 591, 607 (Ill. App. Ct. 2001) ("[W]e believe that no reasonable interpretation of the words 'each year' could find that increases could occur more than once per year for every year of the life of the contract.").

Per D.C. Code § 1-204.41 (a) (2014 Repl. & Supp. 2016), the fiscal year of the District of Columbia runs from October 1 to September 30.

[10] It makes sense that an each-fiscal-year deadline for identifying positions to be abolished during a fiscal year should be set for early in the fiscal year, since, by definition, a fiscal year is "a 12-month period for which an organization plans the use of its funds." *American Heritage Dictionary* 686 (3d ed. 1992).

[11] The fact that the plain language of the Abolishment Act sets a deadline for each agency to make a determination about positions to be abolished under the Act as a budgetary measure each fiscal year may explain why there was no dispute that the RIF discussed in *Dupree*, 132 A.3d at 152, was governed by the general RIF statute, not by the Act. We noted in that case that appellant Dupree "was released from his employment as a criminal investigator with the Department on August 3, 2001, *in one of several RIFs* connected with the closing of the District's correctional facilities in Lorton, Virginia." *Id.* at 152 (italics added).

"necessary," *see* D.C. Code § 1-624.03,[12] it must implement the RIF, if at all, pursuant to the general RIF statute and may not do so under the Abolishment Act.

## 2. *Fiscal emergency vel non*

As already discussed, in explaining in its January 2013 Addendum Decision on Remand how the Abolishment Act operates in relation to the general RIF statute, the OEA reasoned that the Act "was enacted specifically for the purpose of addressing budgetary issues resulting in a RIF." It also reasoned that the Act is a more appropriate statute "for use during times of fiscal emergency[,]" and is "the more applicable statutory provision in order to conduct RIFs resulting from budgetary constraints." It therefore announced a rule, which it has since followed in numerous cases,[13] that it is "primarily guided" by the Abolishment Act for "RIFs authorized due to budgetary restrictions."

---

[12] Section 1-624.03, part of the general RIF statute, states that "[t]he appropriate personnel authority shall be responsible for making a final determination that a reduction in force is necessary and for ensuring that the provisions of this subchapter and rules and regulations issued pursuant to this subchapter are applied when effecting a reduction-in-force within their respective agency."

[13] *See* note 26, *infra*.

This court "routinely accord[s] great deference to [the OEA's] interpretation of . . . the statute which it administers," *Dupree*, 132 A.3d at 155 (internal quotation marks omitted).[14] On that basis, we can accept the OEA's interpretation that it is to be "primarily guided" by the Abolishment Act (rather than "solely guided" by the Act, as the OEA said in its initial decisions on appellants' positions) when it is asked to consider a RIF. We can do so because it is not unreasonable for the OEA, when considering a challenged RIF, to assume that the District of Columbia employing agency has exercised its each-fiscal-year opportunity to identify positions for abolishment under streamlined procedures — unless the agency asserts otherwise or the timing of the agency's final decision to abolish the positions in question precludes that conclusion.

That said, our deference must end there, because the OEA did not consider the significance of the February 1 date (part of the plain language of the Act) by which an agency must make a final determination identifying positions to be abolished during the fiscal year. In addition, contrary to the OEA's reasoning, the

---

[14] *See also Davis v. Univ. of the District of Columbia*, 603 A.2d 849, 851 (D.C. 1992) ("OEA is the agency charged by the CMPA . . . with the responsibility of hearing and adjudicating appeals from District of Columbia agency employees. As such, it should be accorded deference in its interpretation of these provisions of the CMPA."); *Harrison v. Bd. of Trs. of the Univ. of the District of Columbia*, 758 A.2d 19, 22 (D.C. 2000) ("[T]he [CMPA] . . . is administered by the Office of Employee Appeals[.]").

"each subsequent fiscal year" language of the Abolishment Act will not support an interpretation that the streamlined provisions of the Act apply only when there is a fiscal emergency or budgetary crisis. Quite the contrary, while the Abolishment Act had its genesis as a tool for the District to deal with fiscal emergencies, Congress abandoned its previous approach of revisiting § 1-624.08 (a) in connection with each annual appropriation to the District of Columbia, and instead inserted language that transformed the Act into a law that applies without regard to the particular financial circumstances confronting the District in any "subsequent fiscal year[]."[15] Unlike the general RIF statute, the Abolishment Act contains no language indicating that RIFs pursuant to it must be strictly "necessary," D.C. Code § 1-624.03, and Abolishment Act RIFs also are not governed by the general-RIF-statute regulations that specify that a RIF must be based on lack of work, shortage of funds, reorganization or realignment, or the exercise of restoration rights in connection with homeless veterans reintegration programs. *See* 6B DCMR § 2401.1. For these reasons, we conclude that the OEA's interpretation that ties the Abolishment Act to all RIFs that respond to "times of fiscal emergency" (or to budgetary "constraints," "restrictions," or "issues"), is legally

---

[15] As the District's brief aptly puts it, the Abolishment Act "does not impose any requirement for a particular factual predicate before positions are abolished."

erroneous, and we accordingly do not defer to it.[16] *See UDC*, 130 A.3d at 361 ("[T]he Act was passed to provide the District with what Congress considered to be a critical tool, not only for addressing its then ongoing financial crisis, but also to better manage its finances in the future.").

At the same time, and as the foregoing discussion implies, nothing in the Act supports a conclusion that a RIF undertaken in response to a fiscal emergency will always qualify as an Abolishment Act RIF. Our interpretation in this regard may at first glance appear to be at odds with the analysis in *WTU*, but we are satisfied that there actually is no conflict. The RIF in dispute in *WTU* had been announced in a Board of Education resolution dated May 11, 2004, and the affected school personnel were notified in the same month. *See* 960 A.2d at 1125, 1126 n.5. We said variously that "[t]he abolishment was conducted in accordance with the Abolishment Act," *id.* at 1126; that "the Abolishment Act procedures, imposed for budgetary reasons, appear to apply to the 2004 RIF, rather than the general RIF provisions of the CMPA[,]" *id.* at 1125; that because "[t]he Board's May 11, 2004 resolution authorized the 2004 RIF at issue . . . to 'address and eliminate a longstanding structural budgetary problem,' . . . the 2004 RIF triggered the

---

[16] We similarly reject appellants' argument that the Abolishment Act RIF "covers [only] shortage of funds in a fiscal emergency," and their contention that "if the District wishes to conduct a RIF that is not for a fiscal emergency, then it must follow the applicable regulations in the general RIF statute."

Abolishment Act provisions," *id.* at 1132; that "[t]he procedures established in § 1-624.08 appear to have governed that RIF, rather than the regular RIF procedures found in D.C. Code § 1-624.02[,]" *id.*; and that "[t]he ordinary and plain meaning of the words used in § 1-624.08 (c) appears to leave no doubt about the inapplicability of § 1-624.02 to the 2004 RIF[,]" *id.*

We made all the foregoing statements in *WTU* without reference to the timing of the RIF decision involved in that case, i.e., without discussion of when (to use the language of § 1-624.08 (b)) there had been a "final determination that a position within the personnel authority [was] to be abolished." We did so, however, on a record in which the parties agreed that the RIF was an Abolishment Act RIF. Thus, the parties' dispute was not as to whether the Abolishment Act applied, but instead related to whether, in implementing the RIF, the Board of Education should have been guided by its pre-Abolishment Act RIF regulations, or instead should have rescinded those regulations, issued rules that were consistent with § 1-624.08, and implemented the RIF in a manner consistent with the Abolishment Act. *See id.* at 1127–28.[17] Further, notwithstanding our statements

---

[17] We note in addition that the record in that case indicates that even though the RIF was not publicly announced until May 2004, 960 A.2d at 1125-26, the Board of Education had determined by December 2003 (i.e., before February 1 of the fiscal year), to implement the necessary abolishments (but, after the Council

(continued…)

quoted above that suggested that the Abolishment Act governs RIFs imposed to address budgetary problems, we articulated a holding in *WTU* that was (as appellants in the instant case emphasized to the OEA) quite tentative: we "h[e]ld that the Abolishment Act procedures *appear to apply* to the 2004 RIF, rather than the general RIF provisions of the CMPA." *Id.* at 1134 (emphasis added). We also said that "the determination whether the OEA has jurisdiction [on the ground that the RIF was an Abolishment Act RIF] is quintessentially a decision for the OEA to make in the first instance" because of its "specialty in personnel matters." *Id.* at 1131. We "conclude[d] that instead of dismissing appellants' complaints, the trial court should have stayed its proceedings and transferred the case to the OEA for a determination of OEA's jurisdiction; and for initial resolution of appellants' claims, if OEA confirms its jurisdiction." *Id.* at 1125. Given the tentativeness of our holding in *WTU*, we do not believe the opinion in that case is a bar to our holding in the instant case.[18]

---

(…continued)
approved some additional funding for the schools, delayed announcing the RIF and delayed implementing it until the end of the school year).

[18] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[W]e have adopted the rule that no division of this court will overrule a prior decision of this court . . . and that such result can only be accomplished by this court en banc." (footnote omitted)).

To recap what we have concluded in this section: In the beginning, the political and financial context made it clear that the Abolishment Act was meant to address the fiscal crises that continued to confront the District each time Congress updated the Act in connection with District of Columbia appropriations and each time the Council passed similar emergency or temporary legislation. Until late 2000, the Act applied only year-by-year, while the District was regaining its fiscal health. However, the actual language of the Act never required that it be triggered by a fiscal emergency, and when the statute was amended to apply to "each subsequent fiscal year," the provisions of the Act became equally available in years when there was no fiscal emergency. Thus, the Abolishment Act affords agencies a once-per-fiscal-year opportunity to use a streamlined procedure to abolish positions that they have identified before February 1 of the fiscal year, without regard to whether there is a fiscal emergency or budgetary crisis.

## B. Whether the DOH RIF was an Abolishment Act RIF

With the foregoing parameters in mind, we analyze the DOH RIF in dispute here on the basis of the record evidence. We conclude that the OEA did not err in determining that the Abolishment Act governed the RIF.

The documentary record that was before the OEA discloses that during the final quarter of fiscal year 2008, the City Administrator directed DOH to reduce its fiscal year 2009 local-funds budget by $2.919 million. In response, DOH requested approval from then-Mayor Adrian Fenty, in a memorandum dated December 15, 2008, to implement a RIF and recommended that twenty-four positions be abolished across four DOH departments, including sixteen from the CSFP unit. The memorandum noted DOH's intention to save $600,000 per year by outsourcing the program and called the transition "a priority for DOH."[19] On December 29, 2008, Mayor Fenty signed an administrative order identifying and abolishing the recommended positions "due to [l]ack of [f]unds." As described above, the DOH Director sent appellants a notice of the RIF by letter dated December 29, 2008, telling them that they would be separated from service effective January 30, 2009.

Thus, the foregoing undisputed record that was before the OEA established that, prior to February 1, 2009, DOH made a final determination that certain identified positions, including the positions held by appellants, were to be

---

[19] According to the memorandum, while the program is partially funded by the United States Department of Agriculture ("USDA"), the USDA grant "never fully covered operational and administrative costs, including personnel, IT support, rental of warehouse space, and vehicle maintenance."

abolished during fiscal year 2009. Accordingly, the RIF counted as an exercise of the opportunity created by D.C. Code § 1-624.08 (a) and (b) — i.e., as an Abolishment Act RIF.

Appellants resist that conclusion for two reasons. First, they point out that, in announcing and implementing the RIF, DOH followed various procedures required under the general RIF statute, an approach that they argue shows that DOH intended the RIF to be a RIF under the general RIF statute rather than under the Abolishment Act. We agree with the observation by the reviewing Superior Court judge that it is "irrelevant" that DOH completed some of the procedures called for under § 1-624.02 and its implementing regulations. We also agree with the District that the Act did not require District officials to have "intended" to act under any particular statutory authority and that the fact that DOH afforded appellants more process rather than the minimally required process was not a basis for denying DOH the opportunity afforded it under the Abolishment Act.[20]

---

[20] Further, given that the general-RIF-statute regulations define and explain certain terms (such as "lateral competition" and "competitive level") used in the Abolishment Act, *see WTU*, 960 A.2d at 1134, we are not persuaded by appellants' argument that DOH's references, in the thirty-day notices sent to appellants, to the RIF being conducted "in accordance with Chapter 24 of the District's Personnel Regulations" signaled an intent, or bound DOH, to implement the RIF under the general RIF statute.

Second, appellants assert that the Mayor did not, as required by the Act (specifically, § 1-624.08 (i)), "submit to the Council a listing of all positions to be abolished by agency and responsibility center by March 1 of each fiscal year or upon the delivery of termination notices to individual employees." The District responds that nothing in the record supports that assertion. The District's response appears to be correct, which is significant because appellants had the burden of proof on this point. Appellants bore that burden because they needed to show that the RIF was not an Abolishment Act RIF in order to establish that the OEA had jurisdiction to entertain their claims about DOH's noncompliance with various procedural requirements of 6B DCMR Part 2400. *See* 6B DCMR § 628.2 (OEA rule stating that "the agency shall have the burden of proof as to all . . . issues," except for issues of jurisdiction); Record at 90 (OEA order deeming appellants' argument that the OEA could consider a broader range of issues than those described in § 1-624.08 (d) through (f) "to be jurisdictional in nature"); *see also Johnson v. District of Columbia Office of Emp. Appeals*, 912 A.2d 1181, 1183 (D.C. 2006) (upholding the OEA's decision dismissing the employee's appeal for lack of jurisdiction because the employee failed to prove that he was an Educational Service employee who had a right of appeal).

We also note that the Act does not specify the form of the required notice to the Council, and it seems possible that, when signed by the Mayor on December 29, 2008, the Administrative Order listing (by position number, job title, and organization location code) the positions that had been identified for abolishment served as a notice to the world, including the Council, "of all positions to be abolished by agency and responsibility center by March 1 of [the] fiscal year[.]" D.C. Code § 1-624.08 (i).[21]

For the foregoing reasons, we reject appellants' contention that the OEA erred in treating the DOH RIF as an Abolishment Act RIF.

## C. Whether the OEA erred in concluding without an evidentiary hearing that the Abolishment Act procedural requirements were satisfied

---

[21] Further, while the Council referred to February 1 as the "deadline" for agencies to make final decisions on the identification of positions to be abolished (a "deadline" template carried over by Congress in its updates to the Abolishment Act), the Council never referred to the March 1 date for submission to the Council as a "deadline." *See, e.g.*, 42 D.C. Reg. at 6181 (preamble listing as a purpose of the legislation "to require the Mayor to submit to the Council by March 1, 1996, a list of positions to be abolished through a reduction-in-force"); 43 D.C. Reg. at 5427 (same for March 1, 1997). We note, too, that § 1-624.08 (i) states that the Mayor is to give notice to the Council by March 1 "or upon the delivery of termination notices to individual employees[,]" indicating that there is no fixed date by which notice is to be given to the Council.

Because the OEA properly treated the DOH RIF as an Abolishment Act RIF, the only question properly before the OEA (aside from the question of the bona fides of the RIF, which we discuss below) was whether DOH gave appellants, as RIFed employees, the written 30-days' notice required by § 1-624.08 (e) and satisfied the one-round-of-lateral competition requirement established by § 1-624.08 (d).[22] Appellants do not dispute that DOH gave "employee[s] selected for separation[,]" including appellants themselves, "written notice of at least 30 days before the effective date of his or her separation." § 1-624.08 (e). In addition, appellant Prophet does not claim that DOH was out of compliance with the lateral competition requirements as to him. Thus, the issue before us is whether the lateral competition requirement was satisfied as to appellant Stevens.

Appellants were entitled to "one round of lateral competition . . . , which shall be limited to positions in the employee's competitive level." D.C. Code § 1-624.08 (d). Documentary evidence in the record indicates that Stevens and Prophet were in a competitive level designated as "DS-2005-06-03-N" and that all

_____

[22] Under § 1-624.08 (f), appellants were not entitled to challenge before the OEA their separations or the determination that their specific positions were to be abolished. Thus, the OEA had no authority to entertain their claim that the outsourcing that the RIF facilitated violated the (now-repealed) Privatization Act, formerly codified at D.C. Code § 2-301.05 (b).

positions in connection with the CSFP that had that designation (listed on a CSFP organizational chart as "Supply Clerk," "Supply Technician," and "Supplemental Food Clerk" positions) were abolished. We see nothing in the record that indicates whether there were positions with that (or an equivalent) designation within the DOH Nutrition and Physical Fitness Bureau, the "Lesser Competitive Area" designated in the administrative order approved by the Mayor in December 2008. In any event, Stevens does not argue that there were other positions at her competitive level in the Nutrition and Physical Fitness Bureau for which she was entitled to compete — i.e., that the Bureau had other positions "sufficiently alike in qualification requirements, duties, responsibilities, and working conditions" to the position she occupied such that she "could successfully perform the duties and responsibilities of any of the other positions, without any loss of productivity beyond that normally expected in the orientation of any new but fully qualified employee."[23] 6B DCMR § 2410.4. Her argument is rather that she was entitled to "one round of lateral competition at her competitive level *throughout the entire*

---

[23] As Stevens points out, the documentary evidence does appear to show that there were three positions connected with the CSFP, occupied by Twanna Chase Bates ("Administrative Support Staff"), Gregory Foy ("Program Assistant"), and Ivy Isong ("Public Health Nutritionist"), that were not RIFed. The documentary evidence also appears to show that only three of the four CSFP "Nutrition Health Technician" positions (designated as competitive level "DS-640-06") were abolished. However, Stevens does not contend that she was qualified to compete for those positions.

*Agency.*"  Appellants' Br. at 27; Reply Br. at 1, 13 (emphasis added).  That argument is foreclosed by the Abolishment Act.[24]  The Act specifically provides that "the establishment of a competitive area smaller than an agency" is a matter that is not subject to review.  D.C. Code § 1-624.08 (f); *see also BOE*, 109 F.3d at 776 (noting that the Abolishment Act "allow[s] agency heads to establish 'lesser competitive areas within an agency' for purposes of a reduction-in-force" (quoting § 1-624.01)).

Stevens also argues that she was entitled to a hearing to determine whether she was "in the proper competitive level[.]"  However, she proffered no reason supporting a plausible inference that she belonged in a different competitive level within the Nutrition and Physical Fitness Bureau.  Accordingly, we cannot say that the OEA erred in determining that there were no material facts in dispute on the issue of lateral competition and that appellants were not entitled to an evidentiary

---

[24]    The basis of Stevens's claim that the "entire Agency" was the competitive area appears to be the general-RIF-statute implementing regulation stating that (except when justified by the agency in a written request that is approved), "each agency shall constitute a single competitive area."  6B DCMR § 2409.1.  However, because, as we have concluded, the OEA correctly determined that the RIF was an Abolishment Act RIF, that general-RIF-statute regulation did not apply.

hearing on the issue.[25]  *Cf. Anjuwan v. District of Columbia Dep't of Pub. Works*, 729 A.2d 883, 886 (D.C. 1998) (holding that no OEA hearing was required where the employee offered nothing but "[m]ere allegations without more" to support his claim).

We also defer to the OEA's interpretation that where an employee's entire competitive level is eliminated, there is no one against whom he or she could compete, and therefore that the one-round-of-lateral-competition requirement of § 1-624.08 (d) is inapplicable.[26]  This is in accordance with "deference [we owe to the OEA] in its interpretation of the[] provisions of the CMPA[,]" *Davis*, 603 A.2d

---

[25]  Nor are we able to discern any error in the designation of appellants' competitive level.  This is not surprising given that competitive levels have "no judicially manageable standards[.]"  *WTU*, 960 A.2d at 1134.

[26]  We note that the OEA has relied on this interpretation in a number of cases.  *See, e.g.*, *Thompson v. District of Columbia Pub. Sch.*, OEA Matter No. 2401-0122-14, at 5–7 (Jan. 20, 2015); *In re Lee v. District of Columbia Pub. Sch.*, OEA Matter No. 2401-0251-12, at 5 (Mar. 21, 2014); *Smart v. District of Columbia Child & Family Servs. Agency*, OEA Matter No. 2401-0328-10, at 6 (Mar. 4, 2014).  Some of these cases applied the interpretation on facts indicating that the employee/petitioner was in a single-person competitive level that was abolished.  Stevens contends that the OEA erroneously held that she "was properly placed in a single person competitive level."  The factual premise of that argument is incorrect.  The OEA stated, both in its Addendum Decision on Remand and in its initial ruling, that, for both appellants, the "entire competitive level was abolished," without stating that Stevens was, or should have been, part of a single-person competitive level.

at 851, and the OEA's "developed . . . expertise in administering and enforcing the District of Columbia Personnel Regulations[,]"[27] including the provisions of 6B DCMR Part 2400 that address what it means to afford lateral competition. In this case, that principle dictates deference to the OEA's interpretation that no more was required of DOH with respect to the Act's requirement of one round of lateral competition if (as substantial evidence in the record indicates) the RIF abolished appellants' entire competitive level.[28]

### D. Whether appellants were entitled to a hearing on their claim that the RIF was not a bona fide RIF

---

[27] *Hutchinson v. District of Columbia Office of Emp. Appeals*, 710 A.2d 227, 234 (D.C. 1998).

[28] We acknowledge Stevens's argument that because her actual position was "supplemental food clerk," rather than "supply technician" as shown on the DOH Retention Register, she "was not RIF'd from her position of record." As the District points out, in her Petition for Appeal by the OEA, Stevens listed her position title as "Supply Technician," perhaps suggesting that the terms were understood to be interchangeable. In any event, nothing in the record suggests that Stevens's separation was the result of an erroneous description of what position she occupied within the CSFP unit; rather, the record evidence is that her position was abolished in connection with outsourcing of the food program for which she performed "food clerk" functions. Also, Stevens specifically denies that she should have been in a single-person competitive level, a circumstance that still would have triggered application of the OEA's interpretation that no round of lateral competition was required because she had no one with whom to compete. See *supra* note 26.

Appellants assert that the OEA erred by concluding it had no jurisdiction to consider whether the RIF was a "sham." This is actually a non-issue because, in its Addendum Decision on Remand, the OEA exercised jurisdiction and determined that appellants' claims that the RIF was not a bona fide RIF were frivolous. We address instead appellants' argument that the OEA erred by failing to recognize, as appellants contend was required by *Levitt v. District of Columbia Office of Emp. Appeals*, 869 A.2d 364, 366-67 (D.C. 2005), that a hearing was required for the OEA to properly assess their claims that there was no shortage of funds and that the RIF was contrived to cover up DOH's desire to outsource.

The facts of *Levitt* were that the employing agency transferred Levitt, who had served the District of Columbia government for nineteen years, to a newly created Grade 15 position with no supervisory responsibilities (a circumstance that Levitt alleged was "extremely unusual" for a Grade 15 position), and then, less than a month after his new position was created, "abolish[ed] the very position it had specifically created for him." *Id.* at 366. We held that Levitt was entitled to a hearing on his "detailed allegations of improper employment actions" and that the OEA's decision to dismiss Levitt's position without discovery and a hearing was not supported by substantial evidence. *Id.* at 366–67. We quoted *Fitzgerald v. Hampton*, 467 F.2d 755, 758–60 (D.C. Cir. 1972): "Although a separation may

have been stated by an agency to be by a reduction-in-force, when [there are] *non-frivolous allegations of an illegal discharge,* which if proved would constitute an illegal adverse action by the agency, we think a request for a hearing should be granted as a procedural right to which [the requester is] entitled[,]" lest the effect be to "deprive [the employee] of all adverse action procedural rights[.]" *Levitt*, 869 A.2d at 366 n.4 (emphasis in original).

Thus, in *Levitt*, we recognized that a hearing was warranted because the employee had made substantial allegations to the effect that the employing agency had targeted him, rather than a bona fide position he occupied, for elimination, without affording him the procedural protections that apply to terminations for cause.[29] Appellants' allegations are not at all analogous to those in *Levitt* (and likewise are not analogous to the allegations in *Anjuwan* that "the agency-wide RIF was a sham to retaliate against him for his whistleblowing activities," 729 A.2d at 885–86). The undisputed evidence in this case was that the RIF was directed at all or most of the positions in a program area; no evidence was proffered that DOH targeted appellants or other employees individually (and, indeed, as Stevens avers,

---

[29]    *Cf. Wilburn v. Dep't of Transp.*, 757 F.2d 260, 262 (Fed. Cir. 1985) (remanding employee's case to the Merit Systems Protection Board where the employing agency "strongly appears to have abolished the newly created vacant position for reasons personal to [the employee]").

she and other RIFed employees were rehired by the outsourcing contractor to perform the same functions they had performed as DOH employees, albeit at lower salaries). Further, the short answer to appellants' argument that the RIF was implemented for a contrived reason is the point we have discussed above: that no shortage of funds and no other particular factual predicate was required to justify what we have concluded was an Abolishment Act RIF. For that reason, even if the statement in the Mayor's Administrative Order to the effect that the reason for the RIF was a "[l]ack of [f]unds" was incorrect[30] and/or was a contrived explanation to

---

[30] We note that even when reviewing a RIF implemented under the general RIF statute, the OEA lacks "authority to second-guess the mayor's decision about the shortage of funds[.]" *Anjuwan*, 729 A.2d at 885. In any event, there was substantial evidence in the record to support a finding that DOH did have a shortage of funds. The Community Health Administration's Fiscal Year 2009 Local Budget Reduction states that DOH was obliged to reduce its baseline budget by $2.919 million, and the Agency's response to appellants' interrogatories reflects the same information. A Fiscal Year Gap-Closing Plan was created to address the shortage of funds. It appears that the Agency was able to achieve the necessary savings by cutting positions funded with local dollars, but that it could not have accomplished its program goals with only the remaining federally funded positions.

Further, it appears that the larger context was that the District was facing a fiscal emergency. This court noted in *Washington, D.C. Ass'n of Realtors, Inc. v. District of Columbia* that "[i]n November 2008, facing unexpected revenue shortfalls and needing to meet its statutory obligation to present a balanced budget to Congress, the Council . . . declared the existence of a fiscal emergency and outlined the steps that would be taken to meet it." 44 A.3d 299, 301 (D.C. 2012) (footnote signal omitted); *see also* 55 D.C. Reg. 12119, 12119 (Nov. 28, 2008) (citing, in Council Resolution 17-856, a shortfall in local fund revenues for fiscal year 2009 and declaring the existence of a fiscal emergency); 55 D.C. Reg. 12601-

(continued…)

cover up the plan for outsourcing, that did not render the RIF and appellants' resultant separations invalid. Therefore, the OEA did not err in resolving appellants' claims without a hearing.

## E. Whether there were other material issues of fact that necessitated an evidentiary hearing

Finally, appellants argue that a hearing was required to resolve their various other claims. However, the matters that they assert require an evidentiary hearing either relate to claims that the OEA reasonably determined were frivolous (e.g., that the RIF was a sham of the type involved in *Levitt*), or else are pure legal issues (e.g., whether an agency may conduct an Abolishment Act RIF to address a shortage of local funds); legal issues that could be resolved on undisputed facts (e.g., whether the DOH RIF qualified as an Abolishment Act RIF); mixed issues of law and fact that are irrelevant to an Abolishment Act RIF (e.g., did the Retention Register satisfy the requirements of 6B DCMR § 2412); or factual questions the

_____

(…continued)

14 (Dec. 19, 2008) (notice of D.C. Act 17-573, the "Fiscal Year 2009 Balanced Budget Request Emergency Amendment Act of 2008," which enacted substantial budget cuts); Memorandum from the Office of the City Administrator to All Department and Agency Heads (Oct. 29, 2008) (referring to the "proposed FY 2009 Gap-Closing Plan" that would "resolve a projected revenue shortfall of $131 million," and describing the allocation of spending rescissions of approximately $52 million among the various District of Columbia agencies).

answers to which are, for reasons we have explained, immaterial (e.g., what general-RIF procedures did DOH follow, whether DOH "intended" to conduct the RIF pursuant to the Abolishment Act, whether there was a shortage of funds or a fiscal emergency in fiscal year 2009, whether appellants were RIFed to pay for outsourcing the CSFP or for other "improper" reasons, or whether the RIF saved any money). Accordingly, the OEA did not err in ruling that there were no material facts in dispute and that no hearing was required.

**

For the foregoing reasons, we uphold the OEA's decision, and the judgment of the Superior Court is

*Affirmed.*